FRIENDS OF YOSEMITE VALLEY, a non-profit corporation; and Mariposans for Environmentally Responsible Growth, a non-profit corporation, Plaintiffs,

v.

Gale NORTON, in her official capacity as Secretary of the Interior; Department of the Interior; National Park Service; John Reynolds, in his official capacity as Western Regional Director of the National Park Service; David A. Milhalic, in his official capacity as Superintendent of Yosemite National Park; and Robert Stanton, in his official capacity as Director of the National Park Service, Defendants.

No. CV. F00–6191 AWI DLB.

United States District Court, E.D. California.

March 22, 2002.

Julia A Olson, Wild Earth Advocates, Oakland, CA, for Friends of Yosemite Val-

ley, Mariposans for Environmentally Responsible Growth ("MERG"), plaintiffs.

E Robert Wright, United States Attorney's Office, Fresno, CA, for Bruce Babbitt, Dept of Interior, National Park Service, John—Reynolds, David a Mihalic, defendants.

## MEMORANDUM OPINION, CONCLUSIONS OF LAW AND ORDER FOLLOWING BENCH TRIAL

ISHII, District Judge.

In this action Friends of Yosemite Valley and Mariposans for Environmentally Responsible Growth (collectively "Plaintiffs") challenge the June 2000 Merced Wild and Scenic River Comprehensive Management Plan ("MRP") and Final Environmental Impact Statement ("FEIS"), and the August 9, 2000 Record of Decision ("ROD") implementing the MRP and the FEIS. Plaintiffs contend that Defendants have failed to prepare a valid comprehensive management plan that protects and enhances the natural values of the Merced River in Yosemite National Park in compliance with the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.*, ("WSRA"), and have also violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, ("NEPA"), and the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.*, ("APA"). This court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and venue is proper in this district.

### PROCEDURAL HISTORY

On July 12, 1999, the court entered a Memorandum Opinion and Order in *Sierra Club, et al. v. Babbitt, et al.*, 69 F.Supp.2d 1202 (E.D.Cal.1999). In that Memorandum Opinion and Order, the court found that the defendants had violated 16 U.S.C. § 1274(d), a portion of WSRA, by failing to

develop a comprehensive management plan for the Merced River. The court granted the plaintiffs declaratory judgment on their claim that the defendants had violated the APA by failing to adopt a comprehensive management plan for the Merced River, as required by WSRA. The court ordered the National Park Service ("NPS") to prepare and adopt a valid comprehensive management plan for the Merced River as designated under WSRA no later than twelve months after the entry of the court's decision. Based on a request from the NPS, the court subsequently extended the deadline for the NPS to complete a valid comprehensive management plan to August 14, 2000.

The NPS began public scoping pursuant to NEPA for the comprehensive management plan and environmental impact statement ("EIS") in June of 1999. The Merced River Plan Draft EIS was released in January of 2000. The Draft EIS presented five alternatives, including a no action alternative, for consideration. Availability of the Merced River Plan Final EIS was announced in early July 2000. The record of decision on the MRP was signed on August 9, 2000, with a revised record of decision being signed on November 3, 2000. Following completion of the NEPA process for the MRP, the NPS published the Merced Wild and Scenic River Comprehensive Management Plan ("Merced River Plan" or "MRP") in a reference volume specifically designed for park planners and managers.[1]

On August 14, 2000, Plaintiffs filed their complaint in this action. A bench trial was held on November 6, 2001, and the entire case was submitted for decision.

### STANDARD OF REVIEW

■ The review of final agency action is governed by the Administrative Procedure

---

**1.** Citations in this opinion to "MRP" refer to that separate volume.

Act under an "arbitrary or capricious" standard. 5 U.S.C. § 706(2)(A). Absent a showing of arbitrary action, a court must assume that an agency has exercised its discretion appropriately. *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Thus, the standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir.2000)(internal quotations omitted.). An agency's decision should be overturned if it was "arbitrary, capricious, an abuse of discretion, other otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401 (9th Cir.1995). The Ninth Circuit has explained review of agency decisions as follows:

> Review under the arbitrary and capricious standard is narrow and the reviewing court may not substitute its judgment for that of the agency. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (*Marsh*). We must determine whether the agency's decision was made after considering the relevant factors and whether the agency made a clear error of judgment. *Id.* at 378, 109 S.Ct. at 1861. We may reverse the agency's decision as arbitrary or capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Dioxin/Organochlorine Center v. Clarke*, 57 F.3d 1517, 1521 (9th Cir.1995).

*Western Radio Services Co., Inc. v. Espy*, 79 F.3d 896, 900 (9th Cir.1996), *cert. denied*, 519 U.S. 822, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996).

Plaintiffs seek injunctive relief against Defendants. The United States Supreme Court has explained as follows:

> It goes without saying that an injunction is an equitable remedy. It "is not a remedy which issues as of course," *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337–338, 53 S.Ct. 602, 603, 77 L.Ed. 1208 (1933), or "to restrain an act the injurious consequences of which are merely trifling." *Consolidated Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302, 20 S.Ct. 628, 630, 44 L.Ed. 777 (1900). An injunction should issue only where the intervention of a court of equity "is essential in order effectually to protect property rights against injuries otherwise irremediable." *Cavanaugh v. Looney*, 248 U.S. 453, 456, 39 S.Ct. 142, 143, 63 L.Ed. 354 (1919). The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1975); *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–507, 79 S.Ct. 948, 954–955, 3 L.Ed.2d 988 (1959); *Hecht Co. v. Bowles*, supra, at 329, 64 S.Ct., at 591.

> Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a "nice adjustment and reconciliation" between the competing claims, *Hecht Co. v. Bowles, supra,* at 329, 64 S.Ct., at 592. In such cases, the court "balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." *Yakus v.*

*United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944). "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles,* supra, 321 U.S., at 329, 64 S.Ct., at 592.

*Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–12, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The Court later summarized its holding in *Weinberger* as follows:

> We reviewed the well-established principles governing the award of equitable relief in federal courts. *Id.,* at 311–313, 102 S.Ct., at 1802–1804. In brief, the bases for injunctive relief are irreparable injury and inadequacy of legal remedies. In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Although particular regard should be given to the public interest, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Id.,* at 313, 102 S.Ct., at 1803.

*Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

## DISCUSSION

■ Both Plaintiffs and Defendants have filed objections to declarations submitted by the opposing party. It is undisputed that the focal point for judicial review is the administrative record before the agency at the time of the agency's decision and "not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). There are, however,

exceptions to this general rule. In *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988), the Ninth Circuit explained:

> However, certain circumstances may justify expanding review beyond the record or permitting discovery. See, e.g., *Public Power Council v. Johnson,* 674 F.2d 791, 793 (9th Cir.1982). The district court may inquire outside the administrative record when necessary to explain the agency's action. *Id.* at 793–94. When such a failure to explain agency action effectively frustrates judicial review, the court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The court's inquiry outside the record is limited to determining whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision. *Hintz,* 800 F.2d at 829.

> The district court may also inquire outside of the administrative record "when it appears the agency has relied on documents or materials not included in the record." *Id.* In addition, discovery may be permitted if supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action. *Id.*

In the present case, the court has considered the parties' declarations for the purpose of determining whether the NPS considered all relevant factors and explained the grounds of its decision, and also to help explain the background facts and complex scientific matters upon which the case is based. The court is grateful for the assistance the declarations have given to the court in understanding many aspects of the case. The court has not,

however, relied on any of the declarations as a basis for reaching its decision on any issue. Accordingly, the objections of all parties to the declarations filed in this case will be overruled, and all motions to strike portions of declarations will be denied.

Plaintiffs also move to strike the extra-record exhibits attached to the amici brief filed by the Natural Resources Defense Council. Defendants have not opposed this motion. The court finds that the attachment of such exhibits goes beyond the proper purpose of an amicus brief. *See Metcalf v. Daley*, 214 F.3d 1135, 1141 n. 1 (9th Cir.2000)(striking extra-record documents attached to amicus brief); *Banerjee v. Board of Trustees of Smith College*, 648 F.2d 61, 65 n. 9 (1st Cir.1981)(purpose of amicus brief is not to assist a party with its evidentiary claims). Accordingly, the exhibits attached to the amicus brief, along with all portions of the amicus brief which rely on those exhibits will be stricken.

## I. RIPENESS

Defendants contend that Plaintiffs' claims are not ripe for judicial review and that Plaintiffs lack standing. Defendants base this contention on their claim that the MRP does not authorize site-specific development, but rather is a programmatic plan which provides a framework for reviewing specific future projects. Defendants argue that generally, in such situations, there are no justiciable issues ripe for review. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–37, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *Wilderness Society v. Thomas*, 188 F.3d 1130, 1132–33 (9th Cir. 1999); *Environmental Protection Information Center (EPIC) v. Tuttle*, 2001 WL 114422*4–8 (No. C 00–0713 SC, N.D. Cal. Jan. 22, 2001). Defendants rely primarily on *Ohio Forestry Ass'n v. Sierra Club*, in which the Court addressed the justiciability of a forest plan prepared pursuant to the National Forest Management Act ("NFMA"). The NFMA requires the For-

est Service to develop and maintain a forest management plan for each unit of the National Forest System. *See* 16 U.S.C. § 1604(a). The forest plans must provide for multiple uses of forests, including "coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). All permits and contracts for the use of the forests must be consistent with the forest plans. *See* 16 U.S.C. § 1604(i). In *Ohio Forestry Ass'n v. Sierra Club*, the Court explained as follows:

> As this Court has previously pointed out, the ripeness requirement is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).
>
> In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court has examined both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Id.*, at 149, 87 S.Ct., at 1515. To do so in this case, we must consider: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.

*Id.* at 732–33, 118 S.Ct. 1665.

In *Wilderness Society v. Thomas*, 188 F.3d 1130, 1133–34 (9th Cir.1999), the

Ninth Circuit applied the holding in *Ohio Forestry v. Sierra Club* as follows:

> *Ohio Forestry* embraces the eminently sensible proposition that harm is best assessed when it is tangible, rather than theoretical. Thus, for a challenge to a forest plan to be justiciable under the Act, the plaintiffs must allege either (1) imminent concrete injuries that would be caused by the forest plan, such as "allowing motorcycles into a bird-watching area" or "clos [ing] a specific area to off-road vehicles," *see* 523 U.S. at 738, 118 S.Ct. at 1673, or (2) a site-specific injury causally related to an alleged defect in the forest plan. Generic challenges to the sufficiency of forest plans are no longer justiciable, nor are challenges that merely identify affected sites without alleging a harm causally related to the forest plan. *See id.; see also ONRC Action v. BLM,* 150 F.3d 1132, 1136 (9th Cir.1998) (acknowledging that Ohio Forestry "calls into doubt a plaintiff's ability to challenge an agency's adoption of a plan without site-specific actions as the focus of the challenge").

Here, plaintiffs' complaint alleges not only that the Forest Service violated the NFMA by failing to conduct a forest-wide grazing suitability study, but also that the Forest Service violated the NFMA at a site-specific level by approving allotment management plans for the Crooks Canyon/Maverick and the Brady Butte allotments without identifying the lands suitable for grazing on those allotments. In short, the plaintiffs allege that the Forest Service's general methodology in determining grazing suitability in the Forest Plan was flawed, causing site-specific harm by allowing grazing in an area unsuitable for it. Thus, the claims alleged in count one (a general challenge to the Forest Plan) are not justiciable; however, the claims alleged in counts two and three (site specific injury relating to

Crooks Canyon/Maverick and the Brady Butte allotments) are ripe for review. Because the site-specific injury to the two allotments is alleged to have been caused by a defect in the Forest Plan, we may consider whether the Forest Service complied with the Act in making its general grazing suitability determinations in the Forest Plan.

In sum, the *Ohio Forestry* ripeness factors do not weigh against judicial review of counts two and three at this juncture. An actual, site-specific injury causally related to a plan defect has been alleged. The question presented by the plaintiffs—whether the Forest Service is obliged under the NFMA to conduct a distinct grazing suitability analysis—is essentially a question of law. Therefore, the court would not benefit from further factual development of the issue presented. Because the action seeks to compel the agency to comply with an alleged NFMA requirement, judicial intervention would not interfere inappropriately with further administrative action. Finally, our review does invoke "the kind of 'abstract disagreements over administrative policies' that the ripeness doctrine seeks to avoid." *Ohio Forestry,* 523 U.S. at 735, 118 S.Ct. at 1672 (quoting *Abbott Labs. v. Gardner* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). However, count one of plaintiffs' complaint presents a generic challenge which *Ohio Forestry* cautions against adjudicating. Thus, counts two and three of plaintiffs' complaint are ripe for adjudication; count one is not.

Defendants contend that these cases, which share the common characteristic of rejecting a challenge to a forest management plan where further governmental action would be necessary before something environmentally harmful could be approved or implemented, are analogous to

the present case. Defendants argue that before any project could take place which would harm the outstandingly remarkable values ("ORVs") of the Merced River or affect its free flow, it would have to survive a review under the criteria set forth in the MRP. Defendants conclude, therefore, that Plaintiffs' WSRA challenges to the MRP are not ripe for judicial review.

Initially, Plaintiffs assert that their WSRA and NEPA claims became ripe when the FEIS and ROD were issued, citing *Ohio Forestry Assoc. v. Sierra Club.,* 523 U.S. at 737, 118 S.Ct. 1665, *West v. Secretary of the Dept. of Transportation,* 206 F.3d 920, 930 fn. 14 (9th Cir.2000), and *Hells Canyon Alliance v. U.S. Forest Service,* 227 F.3d 1170 (9th Cir.2000). Then, in their opposition brief, Plaintiffs contend that their WSRA claims became ripe when NPS made the decision to adopt Alternative 2 as the comprehensive management plan for the Merced River. Plaintiffs rely on *National Park and Conservation Ass'n v. Stanton,* 54 F.Supp.2d 7, 17 (D.D.C. 1999), in which environmental groups challenged the NPS' plan for management of the Niobrara National Scenic River in Nebraska under WSRA. Under the challenged management plan, the NPS delegated all its responsibilities for managing the Niobrara to an independent local council over which the NPS had virtually no control. In response to the defendants' argument that the issue of the legality of the delegation of the management of the river was not yet ripe, the District Court for the District of Columbia held as follows:

> To prove ripeness, Plaintiffs must show that: (1) delayed review would cause hardship to them; (2) the agency action is final; and (3) the Court would not benefit from further factual development of the issues presented. *Ohio Forestry Ass'n Inc. v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998).

The second prong of the test is undisputed: the EIS, the decision to adopt Alternative B, and the delegation of authority to the Council are all final decisions. Additionally, it is clear that Plaintiffs would continue to suffer hardship from delayed review if NPS' decision was found to be an unlawful delegation to the Council. Defendants argue that Plaintiffs' current claims are merely abstract legal claims, and that further factual development will aid in determining whether NPS has sufficient oversight over the Council to defeat an unlawful delegation claim. Defendants argue that, at a minimum, the Council should be allowed to implement the GMP before the Court considers the issue.

One wonders how long Defendants would have the Court wait—until the River is hopelessly compromised? Allowing the Council to implement the GMP will not change NPS' final delegation decision, and will thus not shed additional light on the legal issue presented by the Plaintiffs. The unlawful delegation claim is ripe and concrete: all agreements relating to the Council's duties have been implemented, and the Court need look no further in deciding whether these duties comprise an unlawful delegation.

*Id.* at 16–17. Plaintiffs also cite *Hells Canyon Alliance,* 227 F.3d 1170, 1176 (9th Cir.2000) as an example of a case in which the court reviewed a recreational management plan for consistency with WSRA after *Ohio Forestry.* The court notes, however, that this case does not address ripeness.

Plaintiffs argue generally that review of comprehensive management plans under the Wild and Scenic Rivers Act is "appropriate and common," citing as examples *Oregon Desert Association v. Singleton,* 47

F.Supp.2d 1182, 1190 (D.Or.1998) and *Oregon Natural Desert Association v. Green*, 953 F.Supp. 1133 (D.Or.1997). Again, neither of these cases address the ripeness issue.

In response to Defendants' argument that the MRP is a programmatic plan and does not authorize site-specific development, Plaintiffs argue that Defendants ignore fundamental flaws in the MRP which make review of it imperative now. Most generally, Plaintiffs argue that the MRP makes final determinations about what resources are ORVS and are therefore afforded protection. Plaintiffs claim that certain ORVs have been illegally eliminated or altered and that they will not be afforded WSRA protection until this court reviews the issue. Among the specific flaws in the MRP alleged by Plaintiffs, is that through its zoning, the MRP authorizes unlimited amounts of the types of use authorized in each zone. Relatedly, Plaintiffs argue that the MRP validates existing uses of the Merced River and its environment which are presently degrading OVRs. Plaintiffs list as this type of existing use the Camp 6 parking lot, which they claim affects scenic, riparian habitat, and free flow, and the unregulated commercial tour buses, which they claim impact the natural quiet.

Turning to the three factors to be considered under *Ohio Forestry Ass'n v. Sierra Club*, Plaintiffs address the first factor of "whether delayed review would cause hardship to the plaintiffs." *Id.* at 732, 118 S.Ct. 1665. Plaintiffs contend that the present situation is not analogous to that in *Ohio Forestry Ass'n v. Sierra Club*, in which the Court found that delayed review would not cause hardship based in part on its conclusion that the challenged provisions of the plan did not create adverse effects "that traditionally would have qualified as harm" such as commanding anyone to do anything or to refrain from doing

anything. *Id.* at 733, 118 S.Ct. 1665. The Court stated that it did not find that the plan currently inflicted "significant practical harm upon the interests that the Sierra Club advances," noting that this was "an important consideration in light of this Court's modern ripeness cases." *Id* at 733—34, 118 S.Ct. at 1670.

Plaintiffs argue that the present case is distinguishable because a comprehensive management plan under WSRA is fundamentally different from a forest plan under the National Forest Management Act. Plaintiffs argue that while a comprehensive management plan may restrict ongoing activities and take preventive or corrective actions to protect and enhance ORVS, a forest plan simply sets forth allowable activities that may or may not take place in the National Forest. Regarding how delayed review would be harmful in the present case, Plaintiffs repeat their arguments that fundamental flaws in the MRP plan make review imperative now. These include determination of ORVs and boundaries which will not be reevaluated in future project-level decisions, and existing types of uses of the Merced River environment which are presently degrading ORVs, including Camp 6 parking and unregulated commercial tour buses. Finally, Plaintiffs argue that Defendants have agreed that it would cause a hardship if review of the MRP was delayed. Plaintiffs cite Exhibit A, page 19, lines 4–22, of the Declaration of Sharon E. Duggan, which is an excerpt of the transcript of a hearing before Magistrate Judge Dennis L. Beck on April 6, 2001. The subject of the hearing was Plaintiffs' motion to amend their complaint to include allegations regarding the Valley Plan. The court finds that in the pages provided in Exhibit A, counsel for Defendants argues against the amendment, claiming that it will delay judicial resolution of the validity of the

MRP, and will prejudice Defendants and the public.

Plaintiffs next address the second factor under *Ohio Forestry Ass'n v. Sierra Club* of "whether judicial intervention would inappropriately interfere with further administrative action." *Id.* at 733, 1670. The Court found that "from the agency's perspective, immediate judicial review directed at the lawfulness of logging and clearcutting could hinder agency efforts to refine its policies," and that there was a real possibility that further consideration would occur before the agency implemented the plan. *Id.* at 736, 118 S.Ct. at 1671. The Court concluded, therefore, that "[h]earing the Sierra Club's challenge now could thus interfere with the system that Congress specified for the agency to reach forest logging decisions." *Id.*

Plaintiffs contend that in opposition to their motion to amend the complaint, Defendants argued that delay in judicial review would be prejudicial and interfere with further administrative action. Plaintiffs again cite Exhibit A to the Duggan Declaration and the transcript of the April 6, 2001 hearing before Magistrate Judge Dennis L. Beck.. Plaintiffs argue that at that hearing, Defendants did not claim that judicial review of the MRP at the present time would interfere with further administrative action, but rather argued the opposite. The court's review of the transcript reveals that at the hearing, Defendants' counsel argued that until the validity of the MRP is determined in this action, Defendants cannot proceed with such projects as the removal of Cascade Dam, the reconstruction of the last mile of the El Portal Road, and the replacing of the temporary bridge at Wawona. Counsel argued that it was very prejudicial to the public interest and the interests of the National Park Service to wait for a judicial determination as to the validity of the

CMP until the validity of the Valley Plan can also be determined in the same action.

Finally, Plaintiffs address the third factor to be considered under *Ohio Forestry Ass'n v. Sierra Club* of "whether the courts would benefit from further factual development of the issues presented." *Id.* at 733, 118 S.Ct. at 1670. Plaintiffs contend that their opening trial brief presents in detail the evidence necessary for the court to rule in this case. Plaintiffs argue that no further factual development is necessary, and that Defendants do not argue to the contrary.

■ Under the Supreme Court's direction set forth in *Abbott Laboratories* and reaffirmed in *Ohio Forestry Ass'n v. Sierra Club*, in deciding whether the Defendants' decision in adopting the MRP is ripe for review, this court must consider both the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration. *Ohio Forestry v. Sierra Club*, 523 U.S. at 732–33, 118 S.Ct. at 1670. Subsequently, in addressing the justiciability of a forest management plan, the court further defined the two issues identified in *Abbott* into the three factors cited and discussed by the parties in the present case. The court finds that the second and third factors are easily resolved in this case and will therefore address them first.

Essentially, Defendants do not dispute that the second and third factors weigh in favor of judicial intervention at this time. As to the second factor of whether judicial intervention would inappropriately interfere with further administrative action, the court's review of the parties' briefs reveals that Defendants do not argue that the court's review of the MRP at this time would significantly interfere with further action on their part. For example, Defendants do not argue, as did the defendants in *Ohio Forestry Ass'n v. Sierra Club*, that

immediate judicial review of the plan at issue would interfere with their efforts to further refine their policies. To the contrary, as Plaintiffs point out, Defendants argued in opposition to Plaintiffs' motion to amend that until the validity of the MRP is determined judicially, it cannot proceed with specific, planned projects. As to the third factor of whether the court would benefit from further factual development of the issues presented, Defendants do not argue that such development is needed. As was the case in *Wilderness Society v. Thomas,* the questions before this court are essentially questions of law. The facts, as set forth in the administrative record, are undisputed.

A more complex issue in this case is presented by the first of the factors from *Ohio Forestry Ass'n v. Sierra Club:* whether delayed review would cause hardship to Plaintiffs. Defendants argue repeatedly that due to the nature of the MRP as having been designed only for guidance for future site-specific projects, rather than for currently implementing such projects, the MRP is not yet ripe for review. Defendants contend that after the Court's ruling in *Ohio Forestry Ass'n v. Sierra Club,* the only thing that remains open to judicial review in a threshold, foundational challenge to a new plan would be a violation of a clear statutory duty. In support of that contention, Defendants rely on *ONRC Action v. Bureau of Land Management,* 150 F.3d 1132, 1139–40 (9th Cir.1998), in which several environmental organizations alleged that the Bureau of Land Management ("BLM") had violated NEPA and the Federal Land Policy Management Act ("FLPMA") by failing to halt certain actions pending completion of an EIS. The Court of Appeals held in part that the FLPMA did not require the BLM to update and monitor land use plans in manner that would require BLM to cease challenged activities. The court explained:

ONRC also contends that BLM has failed to act in accordance with duties established under FLPMA. ONRC points to various provisions in FLPMA and to sections of the Federal Regulations promulgated pursuant to FLPMA to support its contention that "BLM is neglecting its duty under FLPMA to adequately monitor and update its management plans before relying on them in making land management decisions." This relates to ONRC's argument that there are no existing programmatic plans in existence under NEPA because several land use plans have not been revised or amended as required. Specifically, ONRC points to 43 U.S.C. §§ 1701(a)(8), 1712, and 1732(b).

BLM argues that nothing in these provisions provides a clear statutory duty with which a court can require BLM to comply. "The interpretation of a statute by the agency charged with its administration is generally entitled to 'considerable weight.'" *Bolt v. United States,* 944 F.2d 603, 606 (9th Cir.1991) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). "If the agency's construction does not conflict with the clear language of the statute, [the court] will uphold the agency's position if reasonable." *Id.* at 606–07. We conclude that BLM's interpretation is reasonable. See 43 U.S.C. § 1731(b) (discussing BLM's duty to administer FLPMA).

Section 1701 provides several policy statements which require due consideration, but do not provide a clear duty to update land management plans or cease actions during the updating process. [FN5] Section 1712 requires the revision of land use plans when "appropriate." [FN6] Section 1712 also provides the proper procedure and criteria to follow during development or revision of a land

use plan. The language in Section 1712 does not, however, establish a clear duty of when to revise the plans, nor does it create a duty to cease actions during such revisions. Section 1732 also lacks a statement of clear statutory duty. It provides general guidance during decisions on management actions such as granting easements and developing trade. [FN7]

The court finds that in contrast, Plaintiffs in the present case have alleged a violation of a clear statutory duty. Specifically, Plaintiffs have alleged a violation of the requirement under 16 U.S.C. section 1274(d)(1) that NPS "prepare a comprehensive management plan ... to provide for the protection of the river values." In addition to alleging a violation of this overall requirement, Plaintiffs have alleged violations of the statutory duty to address "user capacities, and other management practices necessary or desirable to achieve the purposes of" WSRA, and the requirement to administer the Merced River to protect and enhance its values. 16 U.S.C. §§ 1274(d)(1), 1281(a).

The court finds that Plaintiffs allege the MRP currently inflicts "significant practical harm" upon the interests they advance in regard to the determination of ORVs to be protected and boundaries delineating the river area, one of the factors supporting justiciability under *Ohio Forestry Ass'n v. Sierra Club.* The court further finds that forcing Plaintiffs to wait to raise these issues within a challenge to a site-specific project will in no way make these issues more ripe. It is the very terms of the Merced River Plan which Plaintiffs wish to challenge in regard to these issues, not their implementation. Finally, the court finds that Plaintiffs' allegations are linked to a clear statutory duty of the NPS under 16 U.S.C. section 1274 to "prepare a comprehensive management

plan for such river segment to provide for the protection of the river values."

■ In light of the above, the court finds that Plaintiffs have demonstrated that delayed review of the MRP would cause them hardship. The court finds, therefore, that all three *Ohio Forestry Ass'n v. Sierra Club* factors weigh in favor of justiciability in this case. The court thus concludes that Defendants' decision as set forth in the FEIS, ROD and MRP is now ripe for review.

## II. THE WILD AND SCENIC RIVERS ACT

Plaintiffs contend that the MRP and ROD violate WSRA for the following five major reasons: 1) the MRP lacks baseline data; 2) the MRP illegally eliminates ORVs previously identified and adds new, inappropriate values; 3) the MRP fails to protect and enhance the Merced River's ORVs and free flow; 4) the Yosemite Valley Plan illegally formed the basis of the MRP; 5) the MRP illegally changes part of the Yosemite Valley classification from scenic to recreational.

### BASELINE DATA

Plaintiffs contend that the most fundamental flaw in the MRP is the lack of baseline date upon which the NPS could make proper, informed decisions about how the river should be managed, and what kind of use and development would be sufficiently protective of river values. Plaintiffs claim that the present situation is analogous to that in *ONDA v. Singleton,* 47 F.Supp.2d 1182 (D. Oregon 1998), which involved a challenge to a BLM management plan for the Owyhee Rivers. One of the claims by the plaintiffs was that the BLM had violated NEPA by failing to prepare an environmental impact statement ("EIS"). Specifically, the plaintiffs claimed that because the plan included cat-

tle grazing, which had a significant impact on the environment, the BLM should have prepared an EIS. The BLM argued that because the plan mitigated grazing to avoid significant impacts, and EIS was unnecessary and that its finding of no significant impact ("FONSI") was correct. In finding that the BLM violated NEPA by failing to prepare an EIS, the court explained as follows:

The Plan/EA itself shows that when the BLM made the FONSI, it knew grazing had negatively affected specific sites. However, it had no baseline data on the quality or quantity of vegetation at the affected sites or elsewhere, either for the time of designation or for the drought after designation, which saw more concentrated grazing. The BLM's awareness of its lack of data is demonstrated by the Plan's prescription of an inventory "to determine riparian areas and potentials."

The evidence also shows that at the time the FONSI was made, the BLM had no utilization studies for riparian areas. AR Tab 178, p. 31. So, although the Plan/EA proposed to mitigate grazing with utilization standards of 30, 40 and 50%, these standards were not correlated to existing conditions, because existing conditions were unknown at the time. The standards were not correlated to any utilization studies because the BLM had none. The utilization standards are generally applicable to all upland and riparian areas, rather than site-specific; thus, there is no indication that the utilization standards were intended to remedy negative effects in the degraded areas, rather than merely maintain the status quo. The evidence indicates that the utilization standards represented nothing more than the grazing levels in existence at the time the Plan was promulgated. See AR Tab 178, p. 13 ("Agricultural use is restricted to a limited amount of domestic livestock grazing ... to the extent currently being practiced.") and AR Tab 223, p. 1878 ("The final plan ... recommends management actions ... [which] do not substantially change the existing direction for livestock management within the corridor."). The utilization standards, then, are not only unsupported by data, but also cannot accurately be described as mitigation, since they apparently represent a continuation of current grazing practices—the same conditions identified in the Plan/EA as having produced negative impacts in some areas.

The only other specific mitigation measures set out in the Plan/EA to compensate for the identified negative impacts of cattle grazing are limits on trailing and seasonal restrictions. But these measures are also unsupported by analytical data, and there is no evidence that they represent a departure from practices in existence at the time the Plan was written. Otherwise, the Plan/EA merely sets out optimistic expectations, contingent plans, and anticipated outcomes.

The court concludes that the BLM's "mitigated FONSI" is insufficient to avoid an EIS. The Plan/EA itself identifies specific areas in which cattle grazing is negatively affecting the rivers' ORVs. The BLM's "mitigated FONSI" is not supported by any analytical data; its mitigation measures are not specific to degraded areas and appear to be nothing more than a continuation of the status quo; and it does not reveal how mitigation measures would compensate for the adverse environmental impacts identified in the Plan/EA. There is no evidence in the record that if the utilization standards are something different from the status quo, they are anything more than guesswork, given the absence of an inventory and utilization studies.

The court notes that the Plan/EA contains no statistical data and not a single scientific citation. It is replete with plans to monitor conditions and develop data in the future, but as plaintiffs point out, NEPA requires "that the agency develop the data first, and then make a decision, not make a decision and then develop the data." Plaintiffs' Memorandum in Support, p. 20. *See also Foundation for North American Wild Sheep v. U.S. Dep't of Agriculture*, 681 F.2d 1172, 1179 (9th Cir.1982) ("the very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for ... speculation by insuring that available data is gathered and analyzed *prior to the implementation of* the proposed action.") (Emphasis added).

The EA falls well short of "accurate scientific analysis" and of supplying a "convincing statement of reasons" why continued grazing on the river corridor—recognized in the Plan as having a negative effect on the rivers' ORVs—could have an insignificant impact.

*ONDA v. Singleton*, 47 F.Supp.2d at 1193–94.

Plaintiffs contend that the same errors occurred in the present case. They argue first that the NPS used maps throughout the MRP to identify river boundaries, management zones and the river protection overlay, but did not have basic baseline maps of natural and cultural resources from which to overlay the other management-focused maps. Relying on various declarations, Plaintiffs claim that due to the lack of baseline date, the maps in the MRP are highly inaccurate in terms of boundaries, river protection overlay and size of natural features.

Relatedly, Plaintiffs contend that the administrative record does not contain current surveys specifically conducted for the

MRP/EIS to document the status of rare, threatened or even common species, and claim that even where detailed information was available, it is not reflected in the MRP/FEIS. Plaintiffs cite *Oregon Natural Desert Association v. Green*, 953 F.Supp. 1133 (D.Or. 1997), which involved a challenge pursuant to WSRA, NEPA and the APA to the management plan for the Donner and Blitzen River issued by the BLM. Monitoring data on instream conditions collected over two years was used in the development of the river plan. *Id.* at 1140. Plaintiffs argue that in the present case, the NPS has completely failed to obtain that kind of detailed data for use in the MRP. The import of this argument is unclear, as Plaintiffs do not identify for this court any language in *Green* in which the sufficiency of the monitoring data is discussed.

In response, Defendants contend that the MRP is based on sufficient baseline data to sustain a general management plan action. First, Defendants discuss the standard for a general management plan level action. They argue that the MRP is such a general management plan, which was intended to provide guidance with respect to activities and future projects in and adjacent to the river corridor. Relying on the Director's Order # 2: Park Planning, effective May 27, 1998, Defendants argue that as a general management plan, the MRP was not intended to be a detailed plan and therefore does not call for specific projects. AR19627–19639. In regard to general management plans, the Director's Order # 2 provides as follows:

3.3.1.2 General Management planning will constitute the first phase of tiered planning and decision making. It will focus on why the park was established and what resource conditions and visitor experiences should be achieved and maintained over time. The general management plan will take the long

view, which may be many years into the future when dealing with the time frames of natural and cultural processes. The plan will consider the park holistically (in its full ecological and cultural contexts) as a unit of the national park system and as part of the surrounding region. It will identify the importance of partnerships with others in protecting park resources and providing appropriate visitor services. The general management plan will also identify connections among the various park programs and park management districts. This will help avoid inadvertently creating new problems in one area, while attempting to solve problems in another. Decisions about site-specific actions will be deferred to implementation planning. More detailed, site-specific analyses of implementation plan alternatives will be required before any major federal action is undertaken.

AR 19631.

Defendants argue that WSRA neither mentions the term "baseline date," nor purports to require certain levels of baseline date prior to the adopting of a comprehensive management plan. Repeating their arguments made in regard to ripeness, Defendants argue that the plan at issue is a general management plan, and that as such, review of the sufficiency of the baseline data used to support the MRP is precluded at this time under *Ohio Forestry Ass'n v. Sierra Club*. The court rejects the ripeness and standing argument as to this particular claim for the same reasons it rejected Defendants' argument addressing Plaintiff's challenge to the MRP as a whole. The NPS further argues that Plaintiffs have not pointed to "any clear statutory duty" to conduct various surveys and studies prior to adopting a

comprehensive management plan, and without such a duty, Plaintiffs lack statutory standing to pursue the baseline data issue at this time. *See ONRC Action*, 150 F.3d at 1139—40. Again, the court rejects this argument for the same reasons stated above.[2]

Defendants cite the court to the recent decision in *Isle Royale Boaters Association*, 154 F.Supp.2d 1098 (W.D.Mich.2001), in which the court cited the following excerpt from the NPS Planner's Sourcebook:

GMPs are now defined as conceptual plans that focus on what conditions should be achieved and maintained in parks—with little or no detail about specific actions. Decisions made through a GMP have the potential to affect a park's resources and values on a broad scale, and they are even more likely than smaller-scale implementation plans to have significant long-term impacts and to qualify as major federal actions. These GMPs/EISs are ideal places to discuss ecosystem sustainability and management, biodiversity, community or regional land use planning, and other larger scale issues. These are the kinds of decisions CEQ believed would benefit from EISs and their comprehensive environmental planning and public involvement efforts. Furthermore, courts have been consistent in requiring EISs for large-scale agency decision making.

When a large-scale plan such as a GMP is prepared, the information can and should be less detailed than the site-specific information required in an implementation plan. In most GMPs it will be difficult to conduct the traditional impact analysis where the focus is on quantifiable impacts (the amount of acreage disturbed or the number of ar-

---

**2.** The court rejects Defendants' arguments as to ripeness and standing as to this and any additional claims in response to which these

arguments are raised for the reasons it rejected these arguments as to the entire case.

cheological sites affected) because of the conceptual nature of the plan. Subsequent implementation proposals are "tiered" (procedurally connected) to the broadscale GMP/EIS. Tiering allows the Park Service to "focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe."

NPS Planner's Sourcebook, Director's Ord. #2, at 9–2, http://www.nps. gov/planning/do2/page1. htm. (quoting 40 C.F.R. § 1508.28).

*Isle Royale Boaters Assn.,* 154 Supp.2d at 1127–28.[3]

Finally, Defendants argue that the cases relied upon by Plaintiffs are distinguishable. They argue that both *Oregon National Desert Ass'n v. Singleton* and *Oregon National Desert Ass'n v. Green,* are distinguishable in that both involve cattle grazing, an affirmative activity that negatively changes the status quo of the environment and can be stopped at any time. Defendants claim that because pre-existing structures along the Merced River such as bridges, dams and roads are already part of the status quo, the accumulation of baseline data does not assist in the analysis. Further, Defendants argue that while cattle grazing does not carry out any of the goals of WSRA, most of the preexisting Merced River structures are part of the cultural ORV and allow for visitor enjoyment of the Park, which is one of the goals of WSRA. *See* 16 U.S.C. § 1281(a). Finally, Defendants argue that both cases are also distinguishable in that they involve implementation plans which authorize specific activities, unlike the MRP, which is not an implementation plan.

Moving from its discussion as to the established overall requirements for general management plans, Defendants more specifically address the MRP. In response to Plaintiffs' arguments regarding lack of baseline maps of natural and cultural resources maps, Defendants provide citations to the record demonstrating that maps were used in the workshops it held on the creation of the MRP, and that a great variety of reference materials were utilized by the NPS planning team, including visitor-use data. AR 6092, 6094, 6124, 6130, 6140, 5429, 5508, 6115, 6117, 6168–70. They also argue that the "highly valued resources" ("HVR") map used by the Yosemite Valley Plan to assist in land use decisions was used in the MRP to help delineate or adjust zone boundaries. AR 6343, 6349, 6355. Defendants assert that although many of the resources identified in the ORVs are HVRs, not all HVRs are ORVs, because they are not river-related or river-dependent.

In response to Plaintiffs' contention that the lack of baseline data mapping resulted in highly inadequate maps in terms of boundaries, RPO and the size of the natural features included in the maps, Defendants opine that this accusation stems from a misunderstanding of the application of the river corridor boundaries. They argue correctly that the river corridor boundaries are defined in the MRP, which provides as follows at 35:

> The Merced Wild and Scenic River boundaries are illustrated in figure 1. With the exception of the El Portal Administrative Site, the boundary is defined as one-quarter mile from ordinary high water (as defined by the U.S. Army Corps of Engineers in 33 CFR Section 328.3; see Glossary, Appendix C) for the length of the Merced River within Yo-

---

**3.** The Sourcebook provides at page "i" as follows: "This sourcebook is a companion to the Director's Order on Park Planning (DO–2) and its attached program standards. The purpose of this sourcebook is to provide specific methods, tools, and pointers about how to produce the plans and meet the standards directed by DO–2."

semite National Park. In El Portal, the boundary is defined by the 100–year floodplain of the extent of the River Protection Overlay, whichever is greater, plus adjacent wetlands and meadows.

In response to Plaintiffs' argument that the record does not contain current surveys specifically conducted to document the status of rare, threatened or even common species, Defendants argue first that it intends to protect and enhance habitat for all river-related and river-dependant species, including special status species. They cite the portions of the MRP which set out the criteria and considerations which will be used to evaluate all proposed actions, and which define the outstandingly remarkable values for all segments of the Merced River. MRP 32, 45–47. Defendants correctly assert that the biological ORVs describe outstandingly remarkable biotic communities in each segment, and then list examples of special status species found in each segment. They claim that all river-related or river-dependent special status species are included as ORVs. MRP 45–47. In response to Plaintiffs' contention that the wetland mapping was not adequate to identify all wetlands, Defendants argue that by broadly establishing wetlands as an ORV, it recognized all wetlands are biological ORVs and are to be protected and enhanced.

 In summary, Plaintiffs present the declarations of their experts, who opine that the NPS did not have sufficient data to address resource protection in a manner consistent with WSRA. Plaintiffs further argue at length that whatever resources the NPS had available in creating the MRP were not adequately utilized. The court finds, after an exhaustive review of the parties' arguments, supporting declarations and citations to the administrative record, that Plaintiffs have not met their burden of demonstrating that the NPS acting arbitrarily or capriciously in regard

to acquiring or using baseline data to support the MRP. *See* 5 U.S.C. § 706(2)(A). Plaintiffs essentially argue that the NPS should have used another format for the MRP, based on much more detailed data than was available to the NPS in this case. However, this court may not substitute its judgment for that of the NPS. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. at 376. Under the highly deferential standard which presumes an agency action to be valid, the court finds that there was a reasonable basis, in the form of the Director's Order # 2: Park Planning and the related NPS Planner's Sourcebook, for the NPS' decision to draft the MRP as a general management plan. *See Independent Acceptance Co.*, 204 F.3d at 1251. The court further finds that in light of the undisputed nature of general management plans as "conceptual plans that focus on what conditions should be achieved and maintained in parts—with little or no detail about specific actions," *Isle Royale Boaters Association*, 154 F.Supp.2d at 1128, the NPS did not act arbitrarily or capriciously in creating the MRP using the baseline data that it did. The court notes in particular that the detailed baseline data which Plaintiffs insist the NPS should have gathered might well have become obsolete before any site specific project is proposed. The court therefore finds for Defendants on this issue.

## OUTSTANDINGLY REMARKABLE VALUES

Plaintiffs contend that the NPS acted arbitrarily by eliminating previously identified ORVs and adding new, inappropriate ORVs in the Merced River Plan.

 Defendants correctly state that although WSRA specifies that ORVs are central to both eligibility and management, it does not define the term "outstandingly remarkable value." Defendants explain

that guidance to the meaning of the term is provided in the December 1999 Technical Report "The Wild and Scenic River Study Process," issued by the Interagency Council ("the Study Process Report"). The Study Process Report states:

In order to be assessed as outstandingly remarkable, a river-related value must be a unique, rare or exemplary feature that is significant at a comparative regional or national scale. Dictionary definitions of the words "unique" and "rare" indicate that such a value would be one that is a conspicuous example from among a number of similar values that are themselves uncommon or extraordinary. One possible procedure would be to list all of the river's special values and then assess whether they are unique, rare or exemplary within the state, physiographic province, ecoregion, or the other area of comparison. Only one such value is needed for eligibility.

AR 11259P. The Study Process Report further provides:

While the spectrum of resources that may be considered is broad, all values should be directly river-related. That is, they should:

1) Be located in the river or on its immediate shorelands (generally within 1/4 mile on either side of the river);

2) Contribute substantially to the functioning of the river ecosystem; and/or

3) Owe their location or existence to the presence of the river.

AR 11259Q. The court finds that Plaintiffs fail to demonstrate anything arbitrary or capricious in the NPS decision to adopt these standards set forth in the Study Process Report.

The NPS included descriptions of the river segments, their classifications as wild, scenic or recreational, and the ORVs for each segment in the Draft EIS for the Yosemite Housing Plan which was released in 1996 as a supplement to Yosemite National Park's General Management Plan ("GMP"). Plaintiffs assert that in the precursor case of *Sierra Club v. Babbitt*, 69 F.Supp.2d at 1249, "[t]his Court found that the Draft Yosemite Housing Plan sufficed as compliance with 16 U.S.C. 127(d)(1)." This is inaccurate. What the court found was that the defendants were in compliance with 16 U.S.C. 1274(b) and (c) because the elements required under those sections of the statute were incorporated into the Draft EIS for the Yosemite Housing Plan. The elements of these sections concern establishing boundaries and providing maps and descriptions of the classifications of designated river segments for public notice and inspection. They do not concern the identification of ORVs. Thus, the court's finding that the defendants were in compliance with 16 U.S.C. 1274(b) and (c) had nothing to do with ORVs, and does not, contrary to Plaintiffs' implication, amount to any type of judicial affirmation of the ORVs identified in the Draft Yosemite Housing Plan in 1996.

*Scientific Resources*

Plaintiffs contend that the NPS has eliminated the scientific resource ORV everywhere but in wilderness areas. Plaintiffs argue that in 1996, the NPS identified a scientific ORV for the entire Merced River, defining the scientific ORV of the main stem of the Merced River as, "*Scientific* (entire river)—The river, including the adjacent land area, is a significant scientific resource; it is a watershed entirely within wilderness or Yosemite National Park, invaluable for baseline scientific studies." AR 05529. Now, in the MRP, the scientific ORV of the main stem of the Merced River is defined in Table 2 as, "Scientific—These segments of the river corridor constitute a highly significant scientific resource because the river water-

shed is largely designated Wilderness in Yosemite National Park." MRP, 45. Plaintiffs argue that the Merced River Plan therefore restrict the scientific ORV to Yosemite wilderness.

This argument is meritless. The "segments" referred to in Table 2 of the Merced River Plan as possessing the scientific ORV are identified as: (1) wilderness; (2) valley; (3a) impoundment; (3b) gorge; and (4) El Portal. It is therefore clear from Table 2 that the scientific ORV applies to all portions of the main stem of the Merced River, not just the wilderness segment. The court concludes, therefore, that Plaintiffs have not shown arbitrary or capricious decision-making by the NPS in regard to the scientific ORV.

*Air quality*

Plaintiffs contend that the NPS acted arbitrarily and capriciously in eliminating air quality as an ORV throughout the Merced River corridor, correctly arguing that air quality was identified as an ORV in the 1996 Draft Yosemite Valley Housing Plan for every segment of the Merced River except El Portal.

Defendants contend generally that the NPS considered air quality in light of the standards and guidance for determining ORVs and made a well-reasoned decision to drop air quality as an ORV. Defendants make three supporting arguments, the first of which is that air quality is not listed among the categories of possible outstandingly remarkable values in Section 1271(b) or in any other provision of WSRA.

Second, Defendants argue that it cannot be said that air quality in the area of the Merced River is rare, unique or exemplary or directly river-related within the meaning of those terms as used in the Study Process Report. They claim that the overall quality of the air in any river corridor is a product of conditions within a much larger area. The Merced River in the Yosemite area is located within two air basins, the Mountain Counties Air Basin and the San Joaquin Valley Air Basin. AR 1845, 4581. Defendants argue that Yosemite's air quality is significantly affect by upwind sources, relying on the following statement by the California Environmental Protection Agency: "[T]he California Environment Protection Agency concluded that all of the ozone exceedences in 1995 in the southern portion of the Mountain Counties air basin (i.e. Tuolomne and Mariposa Counties) were caused by transport of ozone and ozone precursors from San Joaquin Air Basin." AR 1843. They argue that Yosemite is in non-attainment status for ozone and PM10 standards. AR 1847, 4583.

Third, Defendants argues that air quality was not listed as an ORV for any part of the Merced River in the Sierra National Forest Draft Forest Land and Resource Management Plan, the eligibility study issued in 1986. AR 7639–7642. They also argue that neither the United States Forest Service ("USFS") or the BLM have identified air quality as an ORV for the portions of the Merced River or South Fork Merced River which they administer. Subsequent planning efforts by the USFS and BLM state that ORVs were previously identified in the 1986 eligibility study. AR 20802, 20918.

Finally, Defendants argue that the fact that Yosemite is designated a Class–I airshed has no bearing on whether it is appropriate for air quality to be designated an ORV under WSRA. A "class-I" designation is not a qualitative evaluation of air quality. Rather, all national parks of a certain size are designated class-I areas regardless of their actual status with respect to air quality standards. 42 U.S.C. § 7472.

■ After reviewing the parties' arguments in this area, the court concludes that Plaintiffs have not demonstrated that the NPS acted arbitrarily or capriciously in eliminating air quality as an ORV for the Merced River.

### Biological ORVs

Plaintiffs contend that Defendants have arbitrarily or capriciously eliminated or generalized biologic values of the Merced River, presenting four main arguments. First, Plaintiffs argue that the NPS has eliminated an "extremely unusual canyon live oak woodland research area," previously identified in 1996 as a biologic ORV of the Gorge segment. AR 05530. Plaintiffs claim that the NPS has provided no rational basis for this decision.

■ In response to Plaintiffs' claim that the NPS has provided no rational basis for its decision to eliminate the "extremely unusual canyon live oak woodland research area" biological ORV, Defendants do not dispute that the woodland was included in the biological ORV description in the 1996 Housing Plan, and that this court referred to it in *Sierra Club v. Babbitt*. Defendants argue that under the Interagency Council's guidelines for what constitutes an ORV, the woodland does not qualify because it is not directly river-related. Defendants cite to Appendix E of the CMP/FEIS, where it is briefly stated under "Reasons for Amendment in the Final Plan" that live oak woodland was removed as an ORV because it is not river-related. Defendants further argue that the removal of the live oak woodland from the list of ORVs will not alter the management of the area under other park plans such as the GMP or the Vegetation Management Plan, nor will it alter the NPS's responsibilities under other applicable federal laws. The court finds that, contrary to Plaintiffs' contention, Defendants have offered a rational explanation for their decision to eliminate the live oak woodland from the ORVs and that Plaintiffs have not carried their burden of demonstrating that Defendants' conclusion that the live oak woodland is not river related is arbitrary or capricious.

Second, Plaintiffs claim that in 1996, the Gorge's biologic ORVs included "diverse riparian areas intact and almost entirely undisturbed," but that the MRP altered this ORV to reflect the damage to the diverse riparian areas from the El Portal road widening project. Plaintiffs argue that it is a violation of WSRA for an agency to establish an ORV, then degrade it to the point that it no longer possesses the qualities it once had, and then eliminate it as an ORV. Plaintiffs argue, citing no authority, that if an identified ORV is degraded, it must be restored, not eliminated.

In response to Plaintiffs' contention that Defendants have degraded the biological ORV and violated WSRA by altering the ORV of "diverse riparian areas intact and almost entirely undisturbed," Defendants note that the language was changed to "diverse riparian areas and associated special-status species that are largely intact and almost entirely undisturbed by humans," and argue that because this language is virtually identical to the 1996 language, any discussion regarding the rewording of the ORV is immaterial. Defendants argue that Plaintiffs have not identified any qualifying ORV element which would be excluded under the reworded version.

■ The court agrees with Defendants that contrary to Plaintiffs' claim, the reworded language in the MRP does not eliminate any ORV. Rather, it appears to be an attempt on the part of Defendants to more accurately describe the area. The court concludes, therefore, that Plaintiffs have not demonstrated that Defendants

acted arbitrarily or capriciously on this issue.

Third, Plaintiffs claim that Defendants have eliminated Wawona Meadow as a biological ORV for Wawona, although it was described in 1996 as, "Wawona Meadow a rare, relatively pristine, lower montane meadow—a threatened plant community in California." AR 05530. Plaintiffs claim that the Wawona Meadow is the only known habitat for the endangered Willow Flycatcher in Yosemite and has some of the greatest diversity of bats in northern California. Plaintiffs rely on the declarations of their experts to argue that to eliminate Wawona Meadow as an ORV because the proposed boundaries do not include it or because it is not hydrologically connected is inaccurate, arbitrary, and inconsistent with other established ORVs. Plaintiffs contend that in light of these outstanding attributes, eliminating Wawona Meadow because it is not hydrologically connected is inaccurate and arbitrary.

Defendants contend that they removed Wawona Meadow from the list of ORVs because the meadow is not directly hydrologically connected to the Merced River. AR 5532. Citing a 1996 report issued by the U.S. Geological Survey prepared in cooperation with the NPS, Defendants argue that although the surface and shallow groundwater that flow through Wawona Meadow end up in the South Fork Merced River, Wawona Meadow is no more hydrologically related to the South Fork than would be an area along a tributary stream. Defendants argue that although the South Fork derives some of its volume by way of the meadow, the meadow is in no way dependent upon the river for either surface flows or groundwater. AR 21987–88. Defendants conclude, therefore, that Wawona Meadow is not "river-related" under the criteria of the Study Process Report. In regard to the Willow Flycatcher, Defendants note that the biological ORVs for

Segment 7, the Wawona segment, includes river-dependent special status species. AR 27428. Defendants argue, therefore, that as a riparian-dependent species listed under the California Endangered Species Act, the Willow Flycatcher would receive protection under the biological ORV for the Wawona river segment.

■ Having previously held that Defendants' reliance on the definitions of ORVs set forth in the Study Process Report was neither arbitrary nor capricious, the court now finds that Defendants' decision that Wawona Meadow does not qualify as "river related" under the definitions of ORVs set forth in the Study Process Report is also neither arbitrary nor capricious. Plaintiffs' arguments to the contrary notwithstanding, the court finds that it is significant that it is undisputed that the meadow is in no way dependent upon the river for either surface flows or groundwater. This fact goes to the third criterium of "river-related" set forth above.

Fourth, Plaintiffs object to the NPS's decision to eliminate peregrine falcons and spotted owls on the basis that they are not river-related species. Plaintiffs offer the following opinions of their experts:

[T]he peregrine falcon "Breeds near wetlands, lakes, rivers, or other water on high cliffs, banks, dunes, mounds" (page 148 Zeiner et al.1990). Terres (1980 page 272) note that the peregrine falcon "... usually lives in open country around rocky cliffs... overlooking rivers and lakes inland". The productive meadows and the riverine forest of the Merced River canyon support many bird species that are the prey for peregrine falcons, and sustain their nesting population in Yosemite Valley. *If the Merced River, with its associated productive meadows and riverine habitat, were absent from Yosemite Valley, it is possible that peregrine falcons would not nest*

*there at all.* To now exclude this species as an ORV because it has no obvious, direct connection to the river is to ignore the vital resources that the Merced River provides for peregrine falcons.

Beedy Dec., ¶ 20 (emphasis added).

According to information from the California Wildlife Habitat Relationships System, the California spotted owl 'Probably requires a permanent water source. May reduce heat stress by bathing.... Requires blocks of 40–240 ha (100–600 ac) of mature forest with permanent water...' (page 334 Zeiner et al.1990). *The Merced River and its tributaries are an important part of what makes El Portal and Yosemite Valley a suitable nesting area for California spotted owls.* This species should still be included as an ORV of the Merced River.

Beedy Dec., ¶ 24 (emphasis added).

■■ Defendants contend that their decision to eliminate peregrine falcons and California spotted owls from the biologic ORV description is not arbitrary, because these species are not river-related under the definition set forth in the Study Process Report. The court finds that the opinions of Plaintiffs' experts, which do not address the standards set forth in the Study Report and relied upon by Defendants, do not demonstrate that the NPS acted arbitrarily or capriciously in this area.

### Geological ORVs

Plaintiffs contend that granite domes were eliminated as geologic ORVS of the river because they are located outside the river corridor. Plaintiffs cite a portion of the "April 2000 MRP Internal Comments Database," in which it is stated that, " '[g]ranite domes' are important evidence of glaciation, which is the basis for Geologic Processes and Conditions ORV." AR 4054. Plaintiffs also complain that the

geologic ORV in Wawona was eliminated, and offer their expert's opinion as to the existence of "river smoothed granitic slabs with their remarkable exposures of veins and dikes of the El Capitan granite intruding into the Gateway tonalite." Cehrs Dec., ¶ 34. Plaintiffs argue that this elimination of granite domes as an ORV was arbitrary and capricious.

Plaintiffs do not identify for what segments the granite domes were eliminated as geologic ORVs. However, the Administrative Record indicates that in the 1996 Draft Yosemite Valley Housing Plan, granite domes were listed as geologic processes/conditions ORVs for segment 1, the wilderness segment of the main stem of the Merced River. For segment 2 geologic processes ORVs, El Capitan is cited as "one of the world's largest exposed granite monoliths." AR 5529. Wawona Dome is identified as a geologic processes/conditions ORV for Wawona, although it is not stated whether this is a granite dome. AR 5531.

In response to Plaintiffs' contentions, Defendants contend that they determined that while the granite domes are directly river-related from a scenic standpoint, to be directly river-related under the ORV category "geologic processes/conditions" the domes themselves would need to be within the river corridor, which they are not. AR 6953, 6265. Therefore, "granite domes" were added to the description of scenic ORVs for segments 1 and removed from the geologic process/conditions ORVs. El Capitan and Wawona Dome were treated similarly, being deleted as geologic process/conditions ORVs and being added as scenic ORVs. AR 5529, 5531, 5534, 5540.

■■ After reviewing the arguments of the parties, the court concludes that the removal of the geologic ORV was well-reasoned under the criteria adopted by the

NPS for the ORVs. The court finds that Plaintiffs have demonstrated nothing arbitrary in the NPS decision that the geologic ORVs must be located within the River boundaries, while scenic ORVs do not have the same limitation. To the contrary, this decision clearly enables the NPS to both comply with the guidelines set forth in the Study Process Report and to include more natural features as ORVs and thus to protect them under WSRA. The court notes that, as Defendants argue, Plaintiffs have in no way demonstrated that protection and management of the geologic process ORVs are lessened when these values are reidentified as scenic ORVs.

### Scenic ORVs

Plaintiffs contend that the Merced River Plan illegally eliminates scenic resources and changes others, primarily to accommodate development. In support of this statement, Plaintiffs note that El Portal does not have any designated scenic ORVs and offer the memo written by Jeff Horn to Deane Swickard, following Merced Wild and Scenic River Meetings held August 25–27, 1999. At the pertinent part, Mr. Horn states:

> But when it came to the El Portal Admin. Site there was some disagreement on a scenic quality ORV for El Portal. Some of the planners were dead set against any ORV that would make development more difficult in El Portal. It seemed absurd to me that there would be any debate over the fact that the El Portal area has scenic qualities, but there was! This ORV was in a NPS scoping document for the original WSRA designation, and now they wanted it removed.

AR 09833, # 1630, Attachment B, p. 2. Mr. Horn ends his report on the meetings by expressing his opinion that, "[t]he El Portal Admin Site is part of the Merced WSR, it has ORVs, denying they exist for the convenience of development is wrong and in my opinion violates the WSRA." *Id.* at 3.

In response, Defendants suggestion that the scoping document referred to by Mr. Horn is presumably the 1986 eligibility study produced by the NPS, USFS and Mr. Horn's agency, the BLM. Defendants correctly assert that this document identifies scenery as "common" in the El Portal segment, and as not qualifying for status as outstandingly remarkable for those river segments below El Portal. AR 7641. Defendants further correctly argue that scenery was not listed as an ORV for El Portal in the 1996 Draft Housing Plan. AR 05530. Defendants argue, therefore, that Plaintiffs are demanding that NPS adopt a completely new ORV for this section.

In response, Plaintiffs assert that it is pure speculation for Defendants to assert that Mr. Horn was referring to the 1986 eligibility study. Plaintiffs, however, do not identify another document to which Mr. Horn could have been referring. The court finds that the nonspecific statement by Mr. Horn relied upon by Plaintiffs, but unexplained by them, is insufficient to establish the existence of a scenic ORV for El Portal in a NPS scoping document for the original WSRA designation. More importantly, the court further finds that the evidence offered by Plaintiffs as to Mr. Horns' comments and opinions are insufficient to establish what the motive of the NPS was in making its final decision not to adopt a scenic ORV for El Portal, or that the NPS acted arbitrarily or capriciously in making that decision.

Plaintiffs claim that black oak woodlands were identified in 1996 as a scenic ORV of the Valley segment of the River, but were marked for removal without any rationale. Plaintiffs cite to Merced River Plan Management Meeting Notes, March 15, 2000, 2:00 p.m., where, under the heading "ORV Discussion" there is the following unex-

plained reference: *"Valley*—Scenic—Remove reference to black oak woodlands. Add text regarding views of river and views from river." Plaintiffs also cite Meeting Notes from a meeting regarding the Merced River Plan held on March 16, 2000, in which it is stated that, "[t]he team reviewed the ORV subgroup's proposed changes to the Draft Plan ORVs (see table below; strikeout/underline text reflects team comments)." In the following table, in reference to the Valley segment, it is stated simply, "remove reference to black oak woodlands" with no explanation given.

In response, Defendants contend that Plaintiffs have misrepresented the status of the black oak woodlands as a scenic ORV, arguing that the administrative record reflects that the specific reference to these woodlands was deleted, but that their inclusion in the ORV was not. On page 05537 of the administrative record, under the broad category of "reasons for amendment in the final plan," the NPS states under scenic ORVs for the Valley, "Remove California black oak woodlands as a specific example. The interface of river, rock, meadow, and forest includes California black oak woodlands." The Merced River Plan provides at page 45 as one of the scenic ORVs of the Valley, "[t]here is a scenic interface of river, rock, meadow, and forest throughout this segment." The court finds that Plaintiffs have not demonstrated that the NPS' decision to delete the specific reference to California black oaks as a scenic ORV was arbitrary or capricious.

■ Finally, Plaintiffs challenge Defendants' decision to limit the scenic ORVs in all sections to views from the river and its banks instead of views from other vantage points. Plaintiffs claim that it is contradictory for Defendants to recognize a view of something which is outside the river corridor, such as El Capitan, as an ORV, but not to recognize a view of the river itself as an ORV. The court is unconvinced by this argument. As Defendants argue, in light of WSRA's focus on protection of the river corridor, it is reasonable to define scenic values as those viewed from a vantage point on the river or its banks.

### Cultural ORVs

Plaintiffs contend that cultural resources have been eliminated and weakened in the Merced River Plan. Specifically, Plaintiffs claim that in comparison with the ORVs identified in 1996, the Merced River Plan significantly alters the focus of the cultural ORVs by diminishing the emphasis on the use of the area by "prehistoric" and "native peoples." In 1996, the cultural ORV for the Valley segment identified, "[o]ver 100 archeological sites; identified as a primary habitation of prehistoric people; riparian areas containing traditionally used plants; Nevada Fall, a documented Native American spiritual area; significant prehistoric trail junction; first land area and river designated for preservation in U.S.; historical resources and landscapes." AR 05529. The MRP now describes the cultural ORV for the Valley as, "this segment contains evidence of thousands of years of human occupation reflected in a large number of archeological sites and continuing traditional use today. Nationally significant historic resources are found here, such as designated landscapes and developed areas, historic buildings, and circulation systems (trails, roads, and bridges) that provide visitor access to the sublime views of natural features that are culturally valuable." MRP, 45; AR 04347.

Plaintiffs further contend that designed landscapes, developed areas and circulation systems, including roads and bridges are not the kinds of resources Congress intended to be deemed ORVs under WSRA. Plaintiffs point out that WSRA

states that in managing rivers, "[p]articular attention shall be given to... road construction, and similar activities which might be contrary to the purposes of this chapter." 16 U.S.C. § 1283(a). Plaintiffs claim that the classification system set forth in WSRA show that development and infrastructure along rivers is not favored. The classification system is set forth in 16 U.S.C. § 1273(b), which provides as follows:

b) Classification, designation, and administration of rivers

A wild, scenic or recreational river area eligible to be included in the system is a free-flowing stream and the related adjacent land area that possesses one or more of the values referred to in section 1271 of this title. Every wild, scenic or recreational river in its free-flowing condition, or upon restoration to this condition, shall be considered eligible for inclusion in the national wild and scenic rivers system and, if included, shall be classified, designated, and administered as one of the following:

(1) Wild river areas—Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.

(2) Scenic river areas—Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.

(3) Recreational river areas—Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

Plaintiffs further contend that the National Rivers Inventory from 1982 disqualified river segments from inclusion in the wild and scenic system based upon numbers of development, bridges, residences, roads and other structures in the river area. AR 07111–07112. Plaintiffs claim that throughout the planning process, the NPS identified roads, parking and bridges as "Land Development and Facilities," not as ORVs, and the delineation of infrastructure as ORV contradicts evidence in the record and contradicts WSRA. Plaintiffs also claim that language was included in regard to the High Sierra Camp to accommodate use and development along the river. Plaintiffs conclude that under the NPS' current approach to cultural resources, "virtually every structure, road and bridge requires protection and enhancement."

In response, Defendants contend that the cultural ORV is far more limited in scope than portrayed by Plaintiffs. Quoting the FEIS for the Merced Wild and Scenic River Comprehensive Management Plan, Defendants argue that the cultural ORV includes only "river-related cultural resources that are not intended to divert the free flow of the river and that are either eligible for or listed on the National Register of Historic Places." AR 4345. Defendants argue that resources either eligible for or listed on the National Register of Historic Places captures only resources that are important enough to warrant protection under the National Historic Preservation Act, 16 U.S.C. §§ 470, et seq. The National Historic Preservation Act establishes the National Register of Historic Places, which includes "districts, sites, buildings, structures and objects" which meet specific criteria regarding "[t]he quality of significance in American history, architecture, archeology, engineering, and culture." 36 C.F.R. § 60.4. Defendants argue that the inclusion of historic resources

within the cultural ORV is particularly appropriate considering that WSRA provides that in the administration of a wild and scenic river, "primary emphasis shall be given to protecting the esthetic, scenic, *historic*, archeologic, and scientific features." 16 U.S.C. § 1281 (emphasis added). Defendants claim that contrary to Plaintiffs' claim, many aspects of the built environment with the Park are not protected by the cultural ORVs, and cite as an example the existing buildings at Yosemite Lodge.

Defendants dispute Plaintiffs' claim that they have diminished the protection afforded to Native American cultural resources in favor of modern tourist features, arguing that the Merced River Plan retains broad protection for ORVs relating to Native American sites and resources. For example, the Wilderness Segment of the Main Stem, Segment 1, includes as cultural ORVs, "portions of a prehistoric trans-Sierra route in use for thousands of years and many prehistoric sites;" Yosemite Valley, Segment 2, includes as cultural ORVs, "evidence of thousands of years of human occupation reflected in a large number of archeological sites and continuing traditional use today;" El Portal, Segment 4, lists as cultural ORVs "some of the oldest archeological sites in the Yosemite area, as well as many historic Indian villages and traditional gathering places." MRP 45–46. Defendants argue that Plaintiffs have not pointed to any Native American cultural resource meeting the criteria of being river-related, not intended to divert free flow and listed on or eligible for the National Register that would not be encompassed by these broadly worded protections.

Defendants assert that based on the limiting criterium that cultural resources be listed on or eligible for the National Register, the NPS added selected historic resources to the description of the cultural ORVs. One of these additions was the Yosemite Valley Historic District (a.k.a., Yosemite Valley Cultural Landscape Historic District), which was determined to be eligible for the National Register after the publication of the 1996 ORVs. AR 19640–19709. Defendants assert that the Yosemite Valley Historic District includes significant cultural features such as designed landscapes, circulation systems, patterns of settlement and the types of structures that are built. The Merced Wild and Scenic River Comprehensive Management Plan/FEIS provides as follows:

> According to the DO–28 *Cultural Resources Management Guidelines* (NPS 1991c), a cultural landscape is:
>
> > ... A reflection of human adaptation and use of natural resources and is often expressed in the way land is organized and divided, patterns of settlement, land use, systems of circulation, and the types of structures that are built. The character of a cultural landscape is defined both by physical materials, such as roads, buildings, walls, and vegetation, and by use reflecting cultural values and traditions.

AR 04605. Defendants assert that it was therefore reasonable for them to revise the cultural ORV for Yosemite Valley to include, "Nationally significant ... designed landscapes and developed areas, historic buildings and circulation systems (trails, roads and bridges) that provide visitors access to the sublime views of natural features."

In response to Plaintiffs' implication that a controversy exists as to the status of Cascades Dam, Defendants stress that to qualify as a cultural ORV, a feature must both (1) be eligible for or listed on the National Register of Historic Places and (2) not intended to divert the free flow of the river. AR 4345. Defendants assert that Cascades Dam, which was intended to

divert the free flow of the river, is not a cultural ORV.

In response to Plaintiff's claims regarding the Merced Lake High Sierra Camp, Defendants contend that instead of attempting to accommodate use and development, as Plaintiffs claim, they were actually doing the opposite. The 1996 Cultural ORVs for the Wilderness segment of the Main Stem Merced River (Segment 1) included, "28 structures at Merced Lake High Sierra Camp and the Merced Lake Ranger Station on the List of Classified Structures." AR 5529. Plaintiffs rely on Meeting Notes from March 16, 2000, in which the following is stated in reference to the cultural ORVs of the main stem Wilderness segment:

> Edit 2nd sentence: "There is evidence of historic high-country use of the river corridor, including homesteading, cavalry activity, and early tourism. (*This sentence made less explicit to allow for the Merced Lake High Sierra Camp to be managed with 'benign neglect'. Change to 'river-related sites on or eligible for the National Register of Historic Places.'* ")

AR 6560. Plaintiffs claim that this language demonstrates that "the cultural ORV was altered over time in an effort to accommodate the kinds of use and development along the river that otherwise would be inconsistent with WSRA." The cultural ORVs for the Wilderness segment set forth in the Merced River Plan include "[t]here are many historic resources such as homestead sites, trails, river crossings, High Sierra Camp sites, and structures." CMP 45, AR 4347.

Defendants argue that by deleting text regarding specific numbers of structures, the NPS allowed itself latitude in the forthcoming Wilderness Management Plan to decide whether the Camp should be managed with benign neglect, thereby allowing it to deteriorate. In support of this

argument, Defendants cite the Merced Wild and Scenic River Comprehensive Management Plan/FEIS in which is listed under activities typical for category 2 diverse visitor experience zones, "Use of High Sierra Camps as allowed in the *Wilderness Management Plan*." AR 04350. Defendants also cite AR 05807, which contains positive comments from members of the public regarding the High Sierra Camps.

Defendants contend that the inclusion of the High Sierra Camps as an ORV is neither new nor arbitrary, arguing that the High Sierra Camp was identified as a recreational ORV in 1986. AR 07640. Defendants also argue that the High Sierra Camp was identified as a special attribute of the Merced River in the Congressional debates leading up to the designation of the Merced under WSRA. AR 06723.

In their reply, Plaintiffs complain that while Defendants define cultural ORVs as including "river-related cultural resources that are not intended to divert the free flow of the river and that are either eligible for or listed on the National Register of Historic Places," this definition allows ORV designation of features which actually do impede the river's free flow, even though they may not have been so intended. Plaintiffs cite roads and bridges, both of which indisputably may impede free flow. Thus, Plaintiffs conclude "while NPS purports to include only cultural resources that do not impede free flow, it in fact does the opposite." Plaintiffs do not discuss why they feel that this would be significant.

 The court has read Defendants' opposition very closely and nowhere in the discussion of cultural ORVs do Defendants purport to include only cultural resources that do not impede free flow. The standard is, rather, "river-related cultural resources that are not intended to divert the free flow of the river and that are either

eligible for or listed on the National Register of Historic Places." AR 4345. Thus, not only do Plaintiffs fail to establish any legal significance to their argument, but the argument itself is based on a false premise.

 In regard to the High Sierra Camp, Plaintiffs contend that the NPS' decision to use general language which it claims give it flexibility not to maintain all 28 camp structures in perpetuity also allows it to arbitrarily and without public review add to the cultural ORV list any structure that meets its broad criteria. The court finds that this speculation regarding possible future action by the NPS is insufficient to support any claim against Defendants. Further, the court notes that because Plaintiffs have demonstrated nothing arbitrary or capricious in the NPS' adoption of the current standard for cultural ORVs, it is unclear how the adoption of an additional ORV which complied with that standard would be improper.

Similarly Plaintiffs also contend that Defendants' discussion of the High Sierra Camps validates their concern that the failure to specifically describe ORVs will lead to "benign neglect" because the particular feature was not specifically referenced and thus not specifically protected. In so arguing, Plaintiffs ignore the fact that the reference to benign neglect arose only in connection with the handling of the High Sierra Camp in the "forthcoming" Wilderness Management Plan. Again, Plaintiffs' expansion of this concept to include ORVs in general is merely speculation and does not demonstrate arbitrariness or capriciousness on the part of Defendants.

In light of all of the above, the court finds in favor of Defendants on Plaintiffs'

contention that the National Park Service acted arbitrarily by eliminating previously identified ORVs and adding new, inappropriate ORVs in the Merced River Plan.

## PROTECT AND ENHANCE MERCED RIVER'S ORVS AND FREE FLOW

Plaintiffs' third main contention is that the MRP fails to protect and enhance the Merced River's ORVs and free flow. In support of this contention, Plaintiffs present the following four arguments: (1) the boundaries are not tied to protection; (2) the MRP fails to address user capacities in manner that protects and enhances values; (3) the management zones are not protective of values; (4) the river protection overlay fails to protect free flow or ORVs.

### Boundaries

Plaintiffs contend that the boundaries established in the MRP for the El Portal segment of the Merced River are not tied to protection of the river. Specifically, Plaintiffs claim that the boundary delineation for the El Portal segment violates WSRA for the following three reasons: (1) the NPS approached the planning for that segment under the misguided belief that the 1958 legislation regarding the El Portal Administrative Site overrides WSRA; (2) the NPS failed to tie river boundaries to the protection of river values; and (3) the 100–year floodplain does not protect ORVs.

The relevant portion of WSRA, 16 U.S.C. § 1274(b), provides that the administrating agency shall establish detailed boundaries which "shall include an average of not more than 320 acres of land per mile measured from the ordinary high water mark on both sides of the river."[4] It is

---

4. It is undisputed that three hundred twenty acres is roughly one-quarter mile on each side of the river.

undisputed that for the entire length of the Merced River within Yosemite National Park, the boundaries set by the NPS constitute the statutory maximum in acreage. Section 1271, which sets forth the policy of WSRA, states that selected rivers, "which, with their immediate environment, possess outstandingly remarkable ... values, shall be preserved in a free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations." Section 1273(b) of WSRA provides that, "[a] wild, scenic or recreational river area eligible to be included in the system is a free-flowing stream and the related adjacent land area that possess one or more of the values referred to in section 1271 of this title." WSRA does not define the terms "immediate environments" or "related adjacent land area." Neither Section 1274(b), Section 1273(b) nor Section 1271 mandate an exact procedure for determining the width of river corridor boundaries, nor do these sections require that boundaries be drawn so as to include the physical location of each and every ORV. The MRP specifically provides at page 35 that, "[b]oundaries ... do not limit the protection of Outstandingly Remarkable Values, which must be protected regardless of whether they are inside or outside the corridor boundaries."

In regard to the El Portal segment, Defendants correctly state that the boundary established in the 1996 Housing Plan for El Portal included only the 100–year floodplain. AR 5528. Defendants argue, therefore, that by establishing the boundary as the extent of the 100–year floodplain or the River Protection Overlay, which ever is greater, the NPS has actually slightly expanded the boundary beyond what was established by the 1996 Housing Plan.

Defendants also argue that the boundaries established by the 1996 Housing Plan were challenged twice and were twice upheld. The court finds this second argument to be meritless. The issue of the validity of the boundaries determinations for the El Portal segment was not addressed in *Sierra Club v. United States,* 23 F.Supp.2d at 1138 or in *Sierra Club, et al. v. Babbitt, et al.,* 69 F.Supp.2d 1202 (E.D.Cal.1999). The issue in those cases was compliance with the requirement under 16 U.S.C. §§ 1274(b) and (c) of notice and definition, not the validity of boundary determinations.

The El Portal Administrative Site is managed under specific statutory authority found at 16 U.S.C. §§ 47–1 through 47–6. The statute, originally enacted in 1958 and amended on October 27, 1986, provides in part as follows:

(a) Establishment of site

To enable the Secretary of the Interior to preserve the extraordinary natural qualities of Yosemite National Park, notwithstanding its increasing use by the public, the Secretary is hereby authorized to provide in the manner hereinafter set forth an administrative site in the El Portal area adjacent to Yosemite National Park, in order that utilities, facilities, and services required in the operation and administration of Yosemite National Park may be located on such site outside the park.

Based on this directive, the 1980 General Management Plan ("GMP") for Yosemite National Park states that NPS headquarters, and the majority of NPS and concessioner administrative and maintenance support facilities will be relocated from Yosemite Valley to El Portal, and that only those facilities essential to the daily operations in the Valley will remain in the Valley. AR 12886, 12909.

Section 1274(d)(1) provides that comprehensive management plans under WSRA "shall be coordinated with and may

be incorporated into resource management planning for affected adjacent Federal lands." Defendants argue that because the GMP is such a plan, it was appropriate and actually necessary for the NPS to consider the GMP's plans for El Portal when preparing the MRP. Defendants claim that during the MRP planning process, it sought to harmonize the Congressional mandates of the El Portal legislation with those found in WSRA. The final environmental impact statement for the MRP expressly states, "The *Merced River Plan/ FEIS* is written within a complex legal framework. The plan must not only comply with the requirements of the Wild and Scenic Rivers Act, it must do so within the parameters of other legislation (see Appendix A) that governs land use within the river corridor." AR 4315. The FEIS then lists some of this other legislation, including the National Park Service Organic Act, the enabling legislation for Yosemite National Park, the Wilderness Act, the El Portal Administrative Site enabling legislation and the legislation relating to a land exchange in the El Portal area. Defendants argue indisputably that this principle of harmonizing statutory authorities is a bedrock principle of Supreme Court jurisprudence. *See Tennessee Valley Authority v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 109, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). The court finds that given the mandate to construe statutes in harmony and the directive in Section 1274(d)(1) to consider resource management plans for affected adjacent Federal lands, the NPS did not act arbitrarily or capriciously in considering the El Portal legislation and the goals of Yosemite National Park's GMP when establishing the boundaries for the El Portal segment of the Merced River.

NPS explains its decision to use the narrow boundary for the El Portal seg-

ment as based on the following factors. First, NPS argues that the 100–year floodplain in El Portal is well-defined, and many areas outside the floodplain and the RPO have been disturbed in the past. Second, as stated above, NPS sought to harmonize the intent of WSRA with the legislation for the El Portal Administrative Site, which was transferred to the NPS so that "utilities, facilities, and services required in the operation and administration of Yosemite National Park may be located on such site outside the park." 16 U.S.C. § 47–1(a). Third, the NPS determined that areas outside the boundary could be used in accordance with the direction of the El Portal legislation without causing direct, adverse impacts to ORVs, and that by moving facilities out of Yosemite Valley, ORVs in that area would be further enhanced. AR 5644–45. The NPS argues therefore that the boundaries established for the El Portal segment represent a reasoned decision by the NPS that the floodplain and RPO-based boundaries, along with the other elements of the MRP, will achieve the purposes of WSRA in this segment of the Merced River.

Finally, in response to Plaintiffs' arguments that the NPS has failed to adopt boundaries in the El Portal segment that comply with boundaries established by the Bureau of Land Management or the Forest Service for the portions of the Merced River they manage, the NPS correctly points out that Plaintiffs provide no authority for the concept that the NPS is required to establish boundaries within the El Portal segment equal to those established by those other agencies.

After reviewing the parties' arguments, the court finds that Plaintiffs have not demonstrated that the NPS acted arbitrarily or capriciously in the creation of the boundaries for the El Portal Segment. Contrary to Plaintiffs' arguments, there is

no indication that the NPS believed that the 1958 legislation overrides WSRA. To the contrary, it appears that the NPS strove to comply with its duty to harmonize the legislation effecting the El Portal area. Further, the NPS' decision regarding the boundaries for the El Portal segment is clearly tied to the protection of river values.

Plaintiffs separately claim the boundaries established in the MRP are inadequately mapped, relying on the language of Section 1274(c), which provides as follows:

Maps of all boundaries and descriptions of designated river segments and subsequent amendments to such boundaries, shall be available for public inspection in the offices of the administering agency in the District of Columbia and in locations convenient to the designated river.

Plaintiffs quote a portion of NPS Summary of Public Comments and Responses at which NPS stated, "[t]he boundaries of the *Merced River Plan* were created through a geographic information system (GIS) using the best available data.... While field surveys were not available for every area of the river, the *Merced River Plan* complies with the Wild and Scenic Rivers Act in providing river boundaries as precise as the best available data will allow." AR 5642. Plaintiffs also quote a subsequent portion of the Summary of Public Comments and Responses at which NPS stated as follows:

The maps used in the *Merced River Plan/FEIS* are conceptual in nature and not intended for use in the planning or design of site-specific projects. In areas where the floodplain defines the corridor boundary, the best available date at the time of the project implementation should be used to determine whether floodplain management practices should be applied.

Plaintiffs argue that these statements indicate that the NPS did not have appropriate data on the ordinary high water mark of the river to map the segments of the Merced River within Yosemite National Park or on the 100–year floodplain to map the boundary in El Portal.

In response to Plaintiffs' arguments regarding the mapping of the boundaries, Defendants claim that the MRP establishes detailed boundaries for the entire corridor. Defendants argue that in the final MRP/EIS, the NPS stated that the boundaries for the segments of the River in Yosemite National Park would begin at the Ordinary High Water Mark ("OHW") and extend out to 1/4 mile and that the El Portal segment would be measured from the OHW to the floodplain or the River Protection Overlay, whichever is greater. AR 4408–4413. At that time, the NPS defined OHW to be the 2.33 year floodplain. AR 5642. However, in the Revised Record of Decision, the NPS clarified that it would use the definition of OHW promulgated by the U.S. Army Corps of Engineers in 33 C.F.R. § 328.3. AR 6061. That definition is as follows:

(e) The term "ordinary high water mark" means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

The use of this regulatory definition is carried forward into the final plan. MRP, Appendix C, Glossary, C–4.

■■■ The Interagency Wild and Scenic Rivers Coordinating Council issued a document in May of 1997 entitled, "Compendium of Questions & Answers Relating to

Wild & Scenic Rivers." AR 11260. In that report, the Interagency Council states in part as follows:

Corridor boundaries for federally designated and administered WSRs may vary based on a number of conditions, but are usually delineated by legally identifiable lines (survey or property lines) or some form of on-the-ground physical features (i.e., topography, natural or man-made features such as canyon rims, roads, etc.), which provide the basis for protecting the river's identified values and practicality in managing those values.

AR 1291. Defendants argue that by adopting the Army Corp of Engineer's definition of ordinary high water mark, the NPS has adopted boundaries delineated by on-the-ground physical features, as approved by the Interagency Council. Defendants conclude that as a result, the NPS has established a definite beginning point and end point for the Merced River corridor's boundaries and this satisfies the requirement in Section 1274(b) for the establishment of detailed boundaries. The court agrees. Further, the court rejects Plaintiffs' contention that the NPS will not determine whether a particular site-specific project falls within the boundaries, because the MRP Criteria and Consideration has that very requirement. MRP 32, 33.

Based on its review of the parties' arguments, the court concludes that Plaintiffs have not demonstrated that the NPS acted arbitrarily or capriciously in regard to the mapping of the river boundaries.

### User Capacities

Plaintiffs contend that the MRP violates the requirement under 16 U.S.C. section 1274(d)(1), that it "address ... user capacities ... to achieve the purposes of this chapter." 16 U.S.C. section 1271, entitled, "Congressional declaration of policy," provides in its initial sentence that, "[i]t is hereby declared to the policy of the United

States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations." The subsequent section, section 1272, is entitled, "Congressional declaration of purpose," provides, "[t]he purpose of this chapter is to implement the policy set out in section 1271 of this title by instituting a national wild and scenic rivers system, by designating the initial components of that system, and by prescribing the methods by which and standards according to which additional components may be added to the system from time to time."

The MRP addresses user capacities in a section entitled, "Visitor Experience and Resource Protection," which provides in part as follows:

The Visitor Experience and Resource Protection (VERP) framework is a tool developed by the National Park Service to address user capacities and is adopted by the *Merced River Plan* to meet the requirements of the Wild and Scenic Rivers Act. It protects both park resources and visitor experience from impacts associated with visitor use, and helps managers address visitor use issues. The VERP framework is an ongoing, iterative process of determining desired conditions (including desired cultural resource conditions, desired natural resource conditions, and desired visitor experiences), selecting and monitoring indicators and standards that reflect these desired conditions, and taking management action when the desired conditions are not being realized. VERP is a decision-making framework, but does not diminish

management's role in decision-making; in fact, management would have to make crucial decisions in determining desired conditions, choosing appropriate management action, and assessing occasional overlap between protecting park resources and providing for visitor experiences.

For the purposes of this plan, the VERP framework will be used as a form of adaptive management. Adaptive management requires a continual learning process, a reiterative evaluation of goals and approaches, and redirection based on an increased information base and changing public expectations. (Baskerville 1985). Knowledge and understanding of visitor use issues will improve and evolve over time, and management actions will adapt accordingly. Continual hypothesis testing, data collection, and data analysis will likely result in refinement of desired conditions and, accordingly, refinement of indications and standards. The implementation of the VERP framework for the Merced Wild and Scenic River corridor will focus on protecting the Outstandingly Remarkable Values and would dovetail with future implementation of the VERP framework outside the river corridor. MRP, 103.

■ Plaintiffs contend that the MRP fails to comply with the requirement of section 1274(d)(1) because it fails to address user capacities in a manner which protects and enhances ORVs of the Merced River. Specifically, Plaintiffs claim that the VERP framework is inadequate because it postpones addressing user capacity for at least five years. In regard to this claim, the court notes that the MRP provides as follows:

Yosemite National Park began development of the parkwide VERP framework in 1998 and continues to develop desired conditions, indicators, standards, and monitoring protocols. The VERP framework outlined herein for the Merced River corridor will be developed and implemented within five years after the final Record of Decision on the *Merced River Plan* and will dovetail with the larger, parkwide VERP program.

In the interim, Yosemite National Park will implement existing management activities (described above) and direction contained in this *Merced River Plan* (e.g., Wild and Scenic Rivers Act Section 7 determination, River Protection Overlay, management zoning prescriptions) to address user capacity, protection and enhancement of Outstandingly Remarkable Values, and management of park resources, visitor use, and facilities. In addition, the National Park Service will initiate increased resource monitoring to ensure that conditions do not deteriorate. Appropriate management actions, consistent with existing management activities, will be implemented to prevent further degradation of resources.

MRP, 110. Under this express language, the court finds that while the VERP process will not be completed for five years, the Plaintiffs are incorrect in claiming that the National Park Service has postponed addressing user capacities for five years.

Plaintiffs also claim that the "essential failing" of the MRP in using VERP to address user capacity is that the MRP describes only how the VERP "would be implemented" and gives only "examples of desired conditions, indicators, standards and the type of management actions that could result from implementation of the VERP framework." Plaintiffs correctly state that the Merced River Plan sets forth as the four key elements of the VERP framework "(1) determination of desired conditions, which are part of the management zoning prescriptions; (2) se-

lection of indicators and standards that reflect the desired conditions; (3) monitoring of the indicators and standards; and (4) implementation of management action when the desired conditions are violated or when conditions are deteriorating and preventative measures are available." MRP, 105. Plaintiffs then argue that the MRP "fails in each regard," because it does not provide final determinations as to these factors for any portion of the Merced River.

The court finds that in so arguing, Plaintiffs ignore the fact, repeatedly stated in the MRP itself, that the VERP is "an iterative process of monitoring, evaluation and adjustment," not a static plan.

Plaintiffs repeatedly object to the fact that VERP does not prescribe maximum visitor use, and assert it that focuses on visitor preference or experience, not ORVs. This assertion ignores the four key elements of the VERP process which are quoted above. It also ignores the following discussion of desired conditions and management zones found within the Merced River Plan:

> The VERP framework relies on the concept of desired conditions, which are contained in the management zoning prescriptions and identify how different areas in the river corridor would be managed. Each management zone prescribes a set of desired resource conditions, desired visitor experiences, and types and levels of uses. The *Merced River Plan* management zoning is designed to protect and enhance the Outstandingly Remarkable Values and free-flowing condition of the Merced River. Desired conditions focus on the Outstandingly Remarkable Values and guide the protection and enhancement of those values, and can be refined over time as knowledge and understanding of conditions and issues improve.

MRP, 106. Thus, under the above language from the MRP, the VERP relies on the concept of desired conditions, which in turn focuses on the outstandingly remarkable values, not upon visitor preferences.

Finally, Plaintiffs claim that other recommendations for addressing user capacity were ignored. The court, however, finds this claim unconvincing, as Plaintiffs point to no distinct alternative, but only discuss general principles which they do not demonstrate are not included within the VERP process.

After reviewing all of Plaintiffs' arguments regarding their views of VERP process as applied to the Merced River Plan, it is clear to the court that Plaintiffs would have greatly preferred that the NPS take a completely different approach to the issue of user capacity, specifically one that would have resulted in distinct rules, numerical and otherwise, in the MRP. The court finds, however, that despite Plaintiffs' apparent assumption to the contrary, the requirement under section 1274(d)(1) that comprehensive management plans "address" user capacities does not mandate that a plan place specific numerical limits on usage. The court further finds that, fundamentally, Plaintiffs object to the fact that VERP is a framework for a process, rather than a completed product. Yet Plaintiffs provide no authority that such a process cannot comply with the requirement of addressing user capacities set forth in section 1274(d)(1).

As has been held repeatedly, review of a final agency action under the arbitrary or capricious standard is a narrow one and the court may not substitute its judgment for that of the agency. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In this case, the court cannot find that the NPS acted arbitrarily or capriciously in creating the

VERP framework as a means by which to comply with the requirement of section 1274(d), although this is clearly not the only means by which the NPS could have done so.

*Management Zones*

Plaintiffs contend that none of the management zones established in the MRP are tied to protection or enhancement of the ORVs or the free flow of the Merced River. Rather, Plaintiffs contend, the management zones show a clear bias in favor of development and visitor use and allow for unlimited use of the type specified for each zone, with the exception of areas within the wilderness. Plaintiffs argue that the management zoning fails to address activities that have degraded river values, but it zones the continuation of existing uses, increased facilities and development throughout the river corridor, which Plaintiffs claim are the very uses causing degradation. Plaintiffs argue that the MRP/EIS is flawed from the outset because it proceeds under the incorrect assumption that WSRA allows the agency to balance the recreational ORVs with the other ORVs.

In response to Plaintiffs' basic contention that the management zones are not tied to protection or enhancement of the ORVs or the free flow of the Merced River, Defendants argue that the management zoning adopted does not exist in a vacuum, but exists as one of seven elements adopted for managing the Merced River, each of which must be satisfied before any new project can be developed or any existing facility can be substantially reconstructed. AR 27414–16. The steps on the ladder of project approval are set forth on pages 32—33 of the MRP and may be summarized as follows. If a project is not within the river corridor, it still must be redesigned or abandoned if there would be an adverse impact to OVRs. MRP 33. If the project is within the river corridor, it must be consistent with the classifications of wild, scenic, or recreational. MRP 32, 33,39. Even if the project is consistent with the river classification, it still cannot go forward unless it protects and enhances ORVs. MRP 39. If the project is within the bed or banks of the Merced River, it must then survive the WSRA Section 7 process. MRP 33, 48–50.

If the project is in the river channel or a width of 150' on each side of the river above 3800' elevation or 100' on each side below 3800', it must also comply with the river protection overlay. MRP 33, 51–55. Any project within the RPO must satisfy strict criteria that supercedes the management zoning. MRP 53–54. If there is an actual conflict between a management zoning prescription and the RPO, "the prescription that provides the greater protection and enhancement of the Outstandingly Remarkable Values takes precedence." MRP 58. If the project has successfully crossed all hurdles to this point, it must also be determined to be compatible with VERP conditions. MRP 109.

Finally, if the project has overcome all obstacles, it is subject to all of the requirements for project implementation. MRP, Appendix B, pp. B–1 through B–12. For example, environmental review will be conducted under NEPA, and "projects shall avoid or minimize adverse impacts to natural and cultural resources." *Id.*, at B–1. Best management practices would be required during construction and resource protection such as soils investigations, wetlands surveys, vegetation surveys, wild life surveys, and special status surveys will be conducted. *Id.*, at B–2—B6.

Defendants contend, in light of this process, that there is no merit to Plaintiffs' claims that management zoning is not linked to protection of ORVs, because the MRP prohibits any new projects within the river corridor that do not protect and

enhance ORVs and prohibits any new projects outside the river corridor that would have an adverse impact to ORVs. Defendants also contend that there is no merit to Plaintiffs' claim of unlimited possible degradation to the free-flow of the river, when the MRP requires any such project to undergo the Section 7 process and project redesign or abandonment if the project would have a direct, adverse impact on river values. The Section 7 process must be done even on emergency projects as soon as possible after the project is completed and changes or mitigation measures taken if the Section 7 analysis deems it necessary. MRP 49–50.

Defendants next respond to Plaintiffs' contention that the management zoning reflects the incorrect assumption that WSRA allows the agency to balance recreational ORVs with other ORVs. Plaintiffs base this contention on the language in 28 U.S.C. § 1281(a) that in administering rivers under WSRA, "primary emphasis shall be given to protecting its esthetic, scenic, historic, archeologic, and scientific features." Defendants note that section 1281(a) also provides that, "[e]ach component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." In response to Plaintiffs' complaint about the zoning of Happy Isles, Defendants argue that it was zoned 2D in recognition of the fact that it is the only portal in Yosemite Valley to major attractions that are special attributes of the area: the John Muir Trail, Vernal Fall, Nevada Fall, Little Yosemite Valley, and Half Dome. MRP 86. Defendants argue that zoning such an area such that it allows for a high level of visitor use does not mean that ORVs will not be protected. Defendants also argue that Plain-

tiffs ignore the fact that the recreational ORV must be protected, and that a critical component of this ORV is the diversity of recreation experience.

In response to Plaintiffs' contention that all of the zoning prescriptions improperly authorize unlimited use in the protected corridor that is known to degrade ORVS and/or free flow, Defendants contend that each zone prescribes the maximum level of activities and facilities allowed. MRP 58. Defendants argue that the management zones do not serve as a blueprint for future development, but are directly tied to protection of resources in order to guide the siting of facilities and uses to areas best able to withstand use. MRP 58, 72–74.

Plaintiffs contend that three out of the four management zones for wilderness improperly authorize recreational stock use and use of the Merced Lake High Sierra Camp pursuant to the Wilderness Management Plan for the Park, without determining that stock use and the Camp within the protected river corridor is compatible with protecting and enhancing the ORVs of the Merced River. The court finds that to the contrary, horseback riding and packing in the wilderness is identified as part of the recreational ORV along the main stem of the Merced River and "historic stock use" is considered a component of the cultural ORV in the wilderness segment of the South Fork. MRP 45, 47; AR 4347, 4368. The Merced High Sierra Camp is listed as a cultural ORV along the wilderness segment of the main stem and is currently eligible for listing on the National Register of Historic Places. AR 4347, 4605–06; MRP 45.

Under the MRP, stock use is allowed throughout the wilderness zones except zone 1A. The stock use is limited to "as allowed in the *Wilderness Management Plan.*" The Merced River Plan/FEIS ac-

knowledges the adverse impacts to wetlands, vegetation, and wildlife habitats caused by trampling and grazing of livestock in the wilderness, but does not prohibit stock use. Rather, it defers any such action to the future update to the *Yosemite Wilderness Management Plan,* which it states will address land management issues within the wilderness. AR 4837, 4849, 4862.

Similarly, the environmental analysis of the MRP/FEIS acknowledges that the possible removal of the High Sierra Camp as may be proposed in an update to the Wilderness Management Plan would reverse the degradation to the area. AR 4837, 4849, 4862.

Finally, on the topic of user capacities, Defendants state that it is the function of the VERP framework to develop standards and indicators that reflect the desired conditions in the river corridor. AR 4388. They argue that while this framework is being developed, existing management actions are in place to address issues relating to user capacities and protection of ORVs. Defendants cite as an example the authority of the Superintendent's Compendium which allows for closure of areas of the park for the purpose of resource protection, including closing areas to or limiting stock use. AR 4394.

The court finds Plaintiffs' attempts to analyze the NPS' decisions as to management zoning in a vacuum to be unpersuasive. As Defendants contend, in determining whether the management zones are tied to the protection and enhancement of the ORVs and the free flow of the Merced River, the management zones must be analyzed as a single part of the larger MRP. The court rejects Plaintiffs' repeated contention that the management zones show a bias in favor of visitor use, but must note that visitor use is not antithetical to the goals of WSRA. Indeed, one of the express purposes of WSRA is

that designated rivers "and their immediate environments shall be protected for the benefit and enjoyment of present and future generations." 28 U.S.C. § 1271. After reviewing all of the parties' arguments, the court finds that Plaintiffs have not shown that Defendants acted arbitrarily or capriciously in regard to the establishment of the management zones.

*River Protection Overlay*

Plaintiffs contend that the river protection overlay ("RPO") is not protective of ORVs because of the facilities allowed in the overlay and because its size and location are not tied to critical river processes, like flooding.

The Merced River Plan provides as follows:

> To ensure that the river channel itself and the areas immediately adjacent to the river are protected, the *Merced River Plan* includes a management tool called the River Protection Overlay. It is intended as a primary mechanism to achieve the goals of the *Merced River Plan.* The River Protection Overlay is also intended to identify the location of highest priority for restoration of hydrologic processes and biotic habitats within the river corridor. This critical zone would provide a buffer area for natural flood flows, channel formation, riparian vegetation, and wildlife habitat and would protect riverbanks from human-caused impacts and associated erosion. The River Protection Overlay is intended to apply the requirements of the Wild and Scenic Rivers Act, including the protection and enhancement of the Outstandingly Remarkable Values and the preservation of the free-flowing condition of the river, at a higher standard than that of the underlying management zones. However, the River Protection

**1106**

Overlay does not apply to private property within the river corridor.

Rivers are dynamic systems. As the movement of the river channel shifts over time, so would the specific areas included within the River Protection Overlay. Regardless of the location of the water's edge of any given day throughout the year, the River Protection Overlay is measured from the ordinary high water mark, as defined by the Army Corps of Engineers in 33 CFR Section 328.3 (see Glossary, Appendix C).

The width of the River Protection Overlay is determined by site topography and vegetation and includes the area needed to encompass riparian and adjacent upland vegetation and habitat. In areas above 3,800 feet, the River Protection Overlay includes the river channel itself and extends 150 feet on both sides of the river measured from the ordinary high water mark; and in areas below 3,800 feet includes 100 feet on both sides of the river measured from the ordinary high water mark. (On the main stem of the Merced River, the 3,800–foot elevation occurs near the Cascades Powerhouse. On the South Fork, the 3,800–foot elevation point occurs approximately one mile downstream of Squirrel Creek.) Generally, a wider band is required along the river in the flatter, open valleys, while a narrow buffer provides adequate protection in the steeper, V-shaped river gorges of the lower elevations (see figure 3). This transition occurs approximately at the 3,800–foot elevation mark, in the gorge area below Yosemite Valley on the main stem of the Merced River, and downstream of Wawona on the South Fork. Approximately 70 miles of the river has a 150–foot River Protection Overlay, including Yosemite Valley and Wawona. Approximately 11 miles of the river has a 100–foot River Protection Overlay, including the El Portal Administrative Site.

Projects occurring within the bed or banks of the river and that affect the free-flowing condition of the river are considered water resource projects under the Wild and Scenic Rivers Act and must also go through a Section 7 determination process.

MRP, 51–52.

Plaintiffs contend that the MRP allows the location of "nonessential facilities" within the RPO when only two criteria are met. Plaintiffs argue the that these facilities are allowed within 100–150 feet of the river if "required for access to or across the river, for health and safety, or for the maintenance of historic properties," and "where it is *impractical* to locate them outside the RPO." MRP, 53. Plaintiffs argue that the RPO therefore does not predetermine levels of protection that are consistent with WSRA, but rather provides NPS with complete discretion to determine when nonessential facilities which adversely affect ORVs or free-flow may be located in the RPO.

In so arguing, Plaintiffs ignore the language of the MRP immediately following the language which they quote. Under the enumerated section on nonessential facilities, there are two subsections. The first subsection addresses "existing facilities" and provides that they may be replaced, repaired, or relocated within the River Protection Overlay, "but only if the replacement, repair or relocation does not directly and adversely affect the Outstandingly Remarkable Values." MRP, 53.

Plaintiffs also contend that the RPO violates WSRA by allowing for the construction of new facilities within the RPO when the above two criteria are met and when they are located "where they do not materially impair the natural function of the river." MRP, 53. Plaintiffs claim that such construction would violate the policy set forth in Section 1271 to preserve the

rivers designated under WSRA in their free-flowing condition. Plaintiffs also argue that the hydrology of the Merced River is an ORV in most segments.

Again, Plaintiffs ignore the express language of the MRP which provides that new facilities and development may be constructed in the River Protection Overlay "where they do not materially impair the natural function of the river, impede linkages to tributary inflow and backwater areas, or disrupt contribution of wood debris to the river, and where they do not have a direct and adverse impact on the Outstandingly Remarkable Values." MRP, 53.

Plaintiffs further contend that the RPO violates WSRA by stating that development may be permitted with the "bed and banks of the river" as long as "[p]roject design minimizes impacts to the free-flowing condition of the river" and "[t]he project incorporates mitigation measures to avoid or reduce impacts." MRP, 53. Plaintiffs argue that WSRA does not allow for degradation and mitigation, but requires protection and enhancement.

■■■■ Defendants correctly argue that Plaintiffs' contentions regarding the allowing by the RPO of location, construction, or development of facilities within the bed and banks of the Merced River is entirely unpersuasive because they ignore a vital component of the MRP directly related to the RPO. As quoted above, at the end of the introductory comments to the RPO section, the MRP states that projects occurring within the bed or banks of the river and that affect the free-flowing condition of the river must *also* go through a Section 7 determination process. In addition, after the description of the conditions relied upon by Plaintiffs to support their contentions, the MRP again provides that facilities and development that occur within the bed or banks of the river and affect the free-flowing condition of the river must

*also* comply with Section 7 of WSRA, which provides in part as follows:

> No department or agency of the United States shall recommend authorization of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration, or request appropriations to begin construction of any such project, whether heretofore or hereafter authorized, without advising the Secretary of the Interior or the Secretary of Agriculture, as the case may be, in writing of its intention so to do at least sixty days in advance, and without specifically reporting to the Congress in writing at the time it makes its recommendation or request in what respect construction of such project would be in conflict with the purposes of this chapter and would affect the component and the values to be protected by it under this chapter.

16 U.S.C. § 1278(a). As explicitly set forth in the MRP, if a project is found to cause direct and adverse impacts, the project must be redesigned for a subsequent Section 7 process or abandoned. MRP, 33, 50. As Defendants argue, the MRP has established a Section 7 determination process which literally requires an Act of Congress before the free flow of the Merced River can be directly and adversely affect by any future project in Yosemite. Based on the above, the court finds that Plaintiffs' contentions that the RPO violates WSRA based on the conditions set forth for location, development and construction within the bed and banks of the Merced River ignore the totality of the MRP and are therefore unpersuasive.

As their final main contention in regard to the RPO, Plaintiffs contend that the size of the RPO is arbitrary and not linked to protecting hydrologic processes and areas

immediately adjacent to and important for protecting the river channel. In particular, Plaintiffs argue that the RPO arbitrarily excludes the floodplain. In response, Defendants first point out that the 100–year floodplain in Yosemite Valley is considered to be part of the hydrologic processes ORV for this segment, and is therefore protected by virtue of its status as an ORV. MRP 45. As to the width of the RPO, Defendants argue that because the establishment of the RPO is discretionary and is not required by WSRA, the width selected is also discretionary. They claim that after much discussion, the NPS chose to use the width recommended by the Sierra Nevada Ecosystem Project report as the basis for its decision.

After considering the arguments of the parties, the court finds that Plaintiffs have failed to demonstrate any arbitrary or capricious decision-making by the NPS in regard to the river protection overlay.

In light of all of the above, the court finds for Defendants on Plaintiffs' claims that the NPS acted arbitrarily or capriciously by eliminating previously identified ORVs and adding new, inappropriate ORVs in the Merced River Plan.

## YOSEMITE VALLEY PLAN

Plaintiffs contend that the Yosemite Valley Plan ("Valley Plan" or "YVP") illegally formed the basis of the MRP. Specifically, Plaintiffs contend that the administrative record and the MRP illustrate that from the outset of the MRP planning process, considerations for the Draft Valley Plan/ EIS, which underwent a first technical review before the close of scoping on the MRP, guided and influenced the MRP in two significant ways: 1) it rushed the MRP planning process; and (2) the Valley Plan's zoning and development agenda are vividly reflected in the MRP. In regard to the first way in which the Valley Plan alleged guided and influenced the MRP,

Plaintiffs allege that self-imposed deadline established by the NPS for the issuance of the Final Valley Plan rushed the planning on the MRP and prevented the NPS from performing necessary surveys and studies to develop baseline information necessary for protecting river values. The court has considered and rejected Plaintiffs' contentions regarding a lack of baseline data above.

In regard to the second way in which the Valley Plan allegedly guided and influenced the MRP, Plaintiffs allege that two areas of zoning in Yosemite Valley, Camp 6 and Taft Toe, were directly driven by the Valley Plan agenda rather than resource protection. Plaintiffs argue that there is no evidence in the record that converting Camp 6 and Taft Toe to transit centers and parking facilities protects and enhances ORVs and free flow. Plaintiffs also allege that in other instances, the MRP management team directed the MRP to be altered in specific ways to accommodate plans in the Valley Plan. These instances are alleged to include the size of the Arch Rock Entrance Station, Housekeeping Camp, Yosemite Lodge, the Devils Elbow picnic area, and Bridalveil Fall.

Defendants contend that by faulting the NPS for coordinating the MRP with the larger planning environment for Yosemite National Park, Plaintiffs fault NPS for complying with the WSRA directive that comprehensive management plans "shall be coordinated with and may be incorporated into resource management planning for affected Federal lands." 16 U.S.C. § 1274(d)(1). Defendants further contend that Plaintiffs' approach runs counter to the subsection of WSRA specifically adding the Merced River to the Wild and Scenic Rivers System. 16 U.S.C. § 1274(a)(62)(A). This statute provides in part, "[w]ith respect to the portions of the river designated by this subparagraph

which are within the boundaries of Yosemite National Park, and the El Portal Administrative Unit, the requirements of subsection (b) of this section [regarding establishing boundaries and classifications] shall be fulfilled by the Secretary of the Interior through appropriate revisions to the general management plan for the park." Defendants argue that this subsection envisions that planning for the river would be coordinated with the 1980 GMP, as opposed to planning for the river notwithstanding the GMP.

In addition to arguing that Plaintiffs have misconstrued the law, Defendants argue that the administrative record demonstrates that the MRP drove decisions in the Valley Plan, not vice versa. For example, Defendants cite meeting notes from August 11, 1999, early in the planning process for the MRP, which state, "[w]ith respect to the YVP, the CMP will be the document from which the YVP must be consistent." They also cite meeting notes from August 17, 1999, which provide as follows:

*Relationship between CMP and other Park Planning Efforts*

Judge Ishii's decision on the State Route 140 lawsuit did specify that the CMP would set the policy direction for the YVP, not the other way around. Park staff view the CMP as providing the overall policy framework for river management in the park as a whole. In addition to the YVP, there are several planning efforts that will be influenced by the CMP. These include the Vehicle Management Plan, the Fire Management Plan, the Wilderness Plan, the Long-range Interpretive Plan, the Vegetation Plan, and possibly others.

AR 6176–77. Defendants also argue that the process used by the NPS in selecting alternatives for the MRP, called Choosing By Advantages, was based on unbiased WSRA-related goals and objectives. AR 6321–38.

 The court has reviewed the specific examples cited by Plaintiffs to support their contention that the MRP was improperly driven by the Valley Plan. The court finds that while these statements or notes demonstrate that the Valley Plan was taken into consideration by the planners for the MRP, they do not demonstrate that the planners improperly allowed the Valley Plan to drive their ultimate decision making in disregard of the mandates and goals of WSRA. To the contrary, the examples provided by Plaintiffs demonstrate that the MRP planners were quite properly coordinating with the Valley Plan, as directed by 16 U.S.C. § 1274(d)(1). The court concludes, therefore, that Plaintiffs have not demonstrated that Defendants acted arbitrarily or capriciously in regard to the influence of the Valley Plan on the MRP. Accordingly, the court finds for Defendants on Plaintiffs' claims that the Valley Plan illegally formed the basis of the MRP.

## YOSEMITE VALLEY CLASSIFICATION

Plaintiffs contend that the MRP illegally changes the classification in the east end of Yosemite Valley from scenic to recreational. Plaintiffs contend that it would violate WSRA to downgrade a river's classification, arguing as follows:

"The National Park Service has previously completed the tasks of... classifying segments of the Merced River as either wild, scenic, or recreational (as required by 16 USC 1274(b).") 64 Fed Reg. 45979 (August 23, 1999). "The Draft [Housing Plan] EIS contains descriptions of the river segments, their classifications (wild, scenic or recreational), and the [ORVs] for each segment." *Sierra Club v. Babbitt*, 69 F.Supp.2d at

1249. While this Court has acknowledged that a river's classification may be altered, that alteration can only move in one direction, i.e., from scenic to wild or from recreational to scenic. *Id.* It would violate WSRA for an agency to downgrade a river's classification if in fact the agency was meeting its duty to protect and enhance the river's values and free flow and not further develop the river area from the levels of development in existence at the time of designation and classification.

In the Merced Wild and Scenic River Comprehensive Management Plan/FEIS, the NPS states as its reasoning for changing the classification of the Merced River in the east end of Yosemite Valley from scenic to recreational the following:

> As described in Chapter II, Alternatives 2, 4, and 5 propose a change in the classification of east Yosemite Valley and Wawona from "scenic" to "recreational." This does not mean that these segments can be developed any more than they could if they were classified as "scenic." Rather, the recreational classification of this segment reflects the current extent of developed areas and facilities within the more extensive boundaries prescribed by these alternatives. The change would therefore allow the classification to match the river corridor conditions defined as "recreational" in the Wild and Scenic Rivers Act.

AR 5533. Plaintiffs contend that the NPS' rationale for altering the classification in the east end of Yosemite Valley is arbitrary and capricious for four reasons. First, Plaintiffs argue that the change is inconsistent with the formal findings in 1996 that the entire Valley segment of the Merced River is free from impoundments and still primitive with shorelines largely undeveloped, but accessible by roads. AR 5526. Second, Plaintiffs argue that river classification cannot be based upon the "current extent of developed areas and

facilities" in 2000, 13 years after the river was designated, unless the extent of developed areas and facilities have diminished, allowing the agency to upgrade classification. Rather, Plaintiffs argue, the classification of a river is done by Congress at the time of designation, or alternatively, by the agency within one year of designation. 16 U.S.C. § U.S.C. § 1274(d)(1). Third, Plaintiffs argue that the NPS' attempt to correlate the size of the boundary with the classification is inconsistent with the legal definitions of the classifications in WSRA. *See* 16 U.S.C. § 1273. Fourth, Plaintiffs contend that the arbitrary nature of the NPS' rationale is exemplified by its inconsistent application of its classification theory throughout the river corridor.

Defendants contend in response that Plaintiffs' contentions must fail because they ignore the following critical factors: (1) WSRA vests discretion in the managing agency to select classifications; (2) the revised classification was in connection with a substantial boundary expansion; (3) Plaintiffs and their amici advocated for a change in the management of this segment from that presented in the 1996 Housing Plan; and (4) the revised classifications mirror the original classifications for the Merced River. In regard to the discretion vested in the NPS, Defendants argue that the definitions of the classifications for rivers eligible to be included in the Wild and Scenic Rivers System are provided in 16 U.S.C. § 1272(b) as follows:

(b) Classification, designation, and administration of rivers

> A wild, scenic or recreational river area eligible to be included in the system is a free-flowing stream and the related adjacent land area that possesses one or more of the values referred to in section 1271 of this title. Every wild, scenic or recreational river in its free-flowing condition, or upon restoration to this condi-

tion, shall be considered eligible for inclusion in the national wild and scenic rivers system and, if included, shall be classified, designated, and administered as one of the following:

(1) Wild river areas—Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America.

(2) Scenic river areas—Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.

(3) Recreational river areas—Those rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past.

Section 1274(b) then provides as follows:

b) Establishment of boundaries; classification

The agency charged with the administration of each component of the national wild and scenic rivers system designated by subsection (a) of this section shall, within one year from the date of designation of such component under subsection (a) (except where a different date if [footnote omitted] provided in subsection (a)), establish detailed boundaries therefor (which boundaries shall include an average of not more than 320 acres of land per mile measured from the ordinary high water mark on both sides of the river); and determine which of the classes outlined in section 1273(b) of this title best fit the river or its various segments.

Defendants next argue that the administrative record shows that the NPS changed the classification in east Yosemite Valley in the Final MRP/EIS as a result of changing the boundary in that segment from the narrower floodplain boundary to the full 1/4 mile. AR 5642–43, 6512–13, 6548–49. In the 1996 Housing Plan, the NPS assigned this segment of the river a floodplain boundary and a "scenic" classification. AR 17489, 17557. These designations were carried forward into the Draft MRP/EIS preferred alternative, and then changed in the Final MRP/EIS. AR 1590–92. Defendants claim that the change in the Final MRP/EIS was made largely in response to public comments, which requested that the boundaries be expanded to include the maximum allowable acreage under WSRA. Plaintiffs do not dispute this.

Defendants contend that having made the decision to expand the boundaries in east Yosemite Valley to 1/4 mile, the MRP team reviewed the classification definitions in WSRA and determined that the classification for a wider east Yosemite Valley corridor would have to be "recreational." AR 6548–49. Defendants argue that this determination is consistent with the guidance provided by the Interagency Guidelines issued jointly by the Department of the Interior and the Department of Agriculture in 1982. AR 11440. In discussing the river classifications under WSRA, the Interagency Guidelines provide as follows:

b. "Shorelines or watersheds still largely primitive." To qualify for scenic classification, the rivers [sic] segment's shorelines and immediate environment should not show substantial evidence of human activity. The portion of the watershed within the boundary of the scenic river may have some discernible existing development. "Largely primitive" means that the shorelines and the immediate river environment still present an overall natural character, but that in

places land may be developed for agricultural purposes.

AR 11444. The Interagency Guidelines further provide:

> c. "Shorelines largely undeveloped" means that any structures or concentration of structures must be limited to relatively short reaches of the total area under consideration for designation as a scenic river area.

AR 11444. Defendants argue that the focus in both of these definitions is on the amount of development within the boundaries, as opposed to simply the amount of development on the banks of the river.

The Interagency Guidelines also provide this general instruction regarding river classification:

> It is important to understand each criterion, but it is more important to understand their collective intent. Each river segment and its immediate environment should be considered as a unit. The basis for classification is the degree of naturalness, or stated negatively, the degree of evidence of man's activity in the river area. The most natural rivers will be classified wild; those some what less natural, scenic, and those least natural, recreational.
>
> Generally, only conditions within the river area determine classification; however, occasionally conditions outside the river area, such as developments which could impact air and water quality, noise levels or scenic views within the river area, may influence classification.

AR 11445. The term "river area" is defined in the Interagency Guidelines to mean, "[f]or designated rivers, the river and adjacent land within the authorized boundaries." AR 11443. Defendants argue that these passages from the Interagency Guidelines reinforce the concept that the administering agency should look at conditions within the entire boundary of the river segment when determining "which of the classes ... best fit the river or its various segments." 16 U.S.C. § 1274(b).

Defendants argue that the NPS followed the Interagency Guidelines in evaluating conditions within the proposed boundaries when determining which classification was most appropriate for each segment of the river. Defendants cite the following excerpt from the Response to Comments section of the Final MRP/EIS:

> The *Draft Merced River Plan/EIS* presented a range of alternatives with regard to the delineation of the Merced Wild and Scenic River boundary. The alternatives that used the 100–year floodplain as a boundary were intended to keep existing major developments, such a lodging and administrative facilities, outside of the boundary; the boundary in these alternatives incorporated Outstandingly Remarkable Values such as riparian areas, meadows, etc. By keeping major development outside of the boundary, Yosemite Valley and Wawona could be classified "scenic." Level of development within the boundary, level of development within the watershed, and river accessibility via roads are the principal factors in the determination of the classification. The *Merced River Plan/FEIS* maintain a range of alternatives with regard to delineation of the Merced Wild and Scenic River boundary. However, the boundary in Yosemite Valley and Wawona has been extended to one-quarter mile in the preferred alternative.

AR 5642–43.

Finally, Defendants contend that Plaintiffs ignore the history of river classifications for the Merced River within Yosemite Valley. Defendants argue that the first detailed eligibility studies for the Merced River were published as part of the 1986 Sierra National Forest Draft Land and

Resource Management Plan ("LRMP"), which was considered to be the official eligibility study required by Congress for Wild and Scenic River designation. AR 6948a, 7592–7682. The study presumed a one quarter mile corridor. AR 7610. Defendants argue that the LRMP described east Yosemite Valley as being "highly developed, with many large campgrounds and access along the riverbanks in many places. Up to 3.1 [cubic feet per second] are diverted for domestic water supply." AR 7637. AR 7637. In its "Eligibility Classification Analysis," the LRMP disqualified the east end of Yosemite Valley for a "scenic" classification on the basis of it not meeting the criteria of "watershed/shoreline largely primitive and largely undeveloped." AR 7643. In light of this background regarding the classifications established at the time the Merced River was designated, Defendants argue that Plaintiffs' contention that the classification of east Yosemite Valley is inconsistent with prior history is incorrect.

 The court finds that despite their strenuous arguments, Plaintiffs cite no authority forbidding an agency from changing the classification of a river segment. Further, contrary to Plaintiffs' assertion, this court did not hold in *Sierra Club v. Babbitt* that such an alteration in a river's classification "can only move in one direction, i.e., from scenic to wild or from recreational to scenic." The court did not address that issue. Furthermore, the court finds that Plaintiffs' arguments ignore the increase in the size of the boundary, an increase which was advocated by Plaintiffs. Finally, the court finds that Defendants offer a rational explanation of the change in classification based on the enlarged boundary including more development. In light of the above, and after reviewing the parties' entire arguments, the court concludes that Plaintiffs have not shown that Defendants acted arbitrarily or capriciously in changing the classification

of the east end of Yosemite Valley from scenic to recreational. The court therefore finds for Defendants on this issue.

## REVISION OF THE GENERAL MANAGEMENT PLAN

Plaintiffs contends that Defendants have violated the following provision of 16 U.S.C. § 1274(a)(62)(A):

> With respect to the portions of the river designated by this subparagraph which are within the boundaries of Yosemite National Park, and the El Portal Administrative Unit, the requirements of subsection (b) of this section shall be fulfilled by the Secretary of the Interior through appropriate revisions to the general management plan for the park, and the boundaries, classification, and development plans for such portions need not be published in the Federal Register. Such revisions to the general management plan for the park shall assure that no development or use of park lands shall be undertaken that is inconsistent with the designation of such river segments.

Specifically, Plaintiffs claim that the NPS has violated this provision by failing to amend the GMP to ensure its consistency with the substantive provisions of the MRP, so that Yosemite National Park is not governed by two conflicting plans for managing river resources.

In response, Defendants initially argue that Section 1274(a)(62)(A) does not require NPS to "amend" its General Management Plan, but refers only to "revisions." Defendants also argue that the statute unequivocally vests discretion in the NPS to determine what revisions to make, providing no specificity on either the scope or the content of the revisions to be made to the GMP.

Further, Defendants argue that through the MRP process, it has made appropriate

revisions to Yosemite's GMP, and these revisions are expressed both in the ROD and in the MRP itself as follows:

The *Merced River Plan* derives its authority from the 1968 Wild and Scenic Rivers Act, as amended, and therefore does not tier directly off the *General Management Plan* as do implementation plans. According to the Wild and Scenic Rivers Act, the river management plan "shall be coordinated with and may be incorporated into resource management planning for affected adjacent Federal land" (16 USC 1274). In designating the Merced as a Wild and Scenic River, Congress authorized the National Park Service to prepare its management plan for the river by making appropriate revisions to the park's 1980 *General Management Plan* (16 USC 1274[a][62]). The management elements of the *Merced River Plan* (see page 29) result in some revisions to the *General Management Plan.* For example, the *Merced River Plan's* management zoning, River Protection Overlay, river corridor boundaries and classifications, and the Outstandingly Remarkable Values would amend the *General Management Plan* by establishing additional land-use designations that would be considered in future site-specific planning. The *Merced River Plan's* Section 7 determination process and Visitor Experience and Resource Protection program are tools that would augment the goals of the *General Management Plan.* Although the *Merced River Plan* amends the *General Management Plan* in certain respects, other aspects, including its five broad goals (see pages 23–24), remain unaffected. Implementation plans and actions affecting the Merced Wild and Scenic River will need to be consistent with these goals and the management elements contained in the *Merced River Plan.*

MRP, 19; *see* AR 6033. Defendants argue that this statement leaves no doubt as to which aspects of the GMP were revised by the MRP.

■ As Plaintiffs argue, this language from the MRP and the almost identical language from the ROD do not demonstrate that the NPS ever looked at whether the MRP or the requirements of WSRA required an amendment or revision to the GMP. Rather, it demonstrates that the NPS simply considered the MRP as a plan that must be considered in addition to the GMP for site-specific projects. By failing to provide references to a revised version of the GMP, or to any particular page or line of the GMP which has been revised, the NPS has failed to demonstrate that it has revised the GMP to meet the requirements of section 1274(b), as required by section 1274(a)(62)(A). The court must conclude that the NPS acted arbitrarily or capriciously in failing to comply with this express requirement of WSRA and therefore finds for Plaintiffs on this issue.

The court further finds that Plaintiffs have demonstrated irreparable injury on this issue and that legal remedies are inadequate to compensate Plaintiffs for Defendants' failure to comply with their statutory duty. *See Weinberger v. Romero–Barcelo,* 456 U.S. at 311–313, 102 S.Ct. 1798. Accordingly, the court will grant Plaintiffs a mandatory injunction requiring Defendants to revise the GMP to meet the requirements of section 1274(b), as required by section 1274(a)(62)(A).

### WATER POLLUTION

Plaintiffs contend that Defendants have failed to comply the requirement under 16 U.S.C. § 1283(c) that, "[t]he head of any agency administering a component of the national wild and scenic rivers system shall cooperate with the Administrator, Environmental Protection Agency and with the

appropriate State water pollution control agencies for the purpose of eliminating or diminishing the pollution of waters of the river." It is undisputed that in this instance the California Regional Water Quality Control Board, Central California Region ("Board") is the appropriate State water pollution control agency. *See* 33 U.S.C. § 1342(b). Plaintiffs claim that the NPS has repeatedly violated a water quality discharge permit issued to it by the Board; has allowed numerous sewage spills due to its failure to take actions required by the permit and subsequently reiterated by a Cleanup and Abatement Order; and has failed to give the Board the opportunity to comment on its draft MRP. Plaintiffs claim that through these actions, the NPS has failed to cooperate with the Board to eliminate or diminish pollution in the Merced River.

In response, Defendants contend that the NPS does not merely cooperate with the Board, but has a history of open and consistent cooperation with the Board as documented by its timely responses to notices of violations ("NOV") and operational recommendations as provided by the Board from routine inspections. Defendants argue that the NPS has always provided appropriate and effective corrective actions in-line with the systems inspection reports and NOVs, when they occur.

Defendants respond at length to the specific factual allegations made by Plaintiffs, explaining for example that many of the instances noted by Plaintiff were not NOVs, but rather notices from NPS to the Board, made as part of its monthly self-monitoring report schedule, that it failed to meet operational parameters. By the time of the NPS notification to the Board, the operational failures had already been corrected and no NOV was issued. Defendants also discuss the NPS' response to the August 2, 2000, Cleanup and Abatement Order, which ordered the NPS to "employ whatever means are necessary to abate future discharges from the El Portal [Wastewater Treatment Facility] and collection system in violation of [the permit]." AR WQ 00958. Defendants explain that the NPS required Yosemite Concession Services Corp. ("YCS") to submit an "Outline of Grease Management Plan" by October 1, 2000, and the completed Grease Management Plan was received from YCS on November 7, 2000. AR WQ 00809, 01332–86. Defendants state that the plan has been submitted to the Board and is being implemented. Defendants also discuss the availability of various funds for sewer repair, relying in part on the declaration of Edward William Delaney, Jr., who opines that money from the 1997 Emergency Appropriation is not available for sewer system deficiencies that existed prior to the flood of 1997. Finally, Defendants argue that copies of the MRP were reviewed by all relevant agencies in the State of California. Defendants explain that the NPS submitted the Draft MRP/ EIS to the Governor's Office of Planning and Research, State Clearinghouse, which coordinates state agency review of environmental documents. AR 09833. In an attachment to their March 15, 2000 letter to the NPS, the State Clearinghouse indicated that a copy of the MRP had been sent by the State Clearinghouse to fourteen state agencies including State Water Resources Control Board, Division of Water Rights, and the Regional Water Quality Control Board, Region 5 (Fresno). Delaney Decl., Ex. 1.

The court takes judicial notice of *United Anglers of California v. United States Department of Interior, et al.,* CV F 00–6768 AWI DLB, the settlement agreement entered therein, and the resulting stipulation of dismissal filed in this court on November 19, 2001. *United Anglers* was an action under Section 505 of the Clean Water Act, 33 U.S.C. § 1365, alleging unlawful

discharges from the sewer collection system at Yosemite National Park. The settlement agreement provides for the NPS to take specified actions, by specified dates, to inspect, clean, and repair the sewer collection system.

 While the court finds it unnecessary to discuss here each factual allegation by Plaintiffs and each response by Defendants, the court has reviewed every allegation in the parties' papers. The court finds that although it is undeniable that the NPS is confronted with a difficult situation stemming, as it says, from "an antiquated system, intensive visitor use, and fragile environmental condition," the NPS's record in this area is clearly not stellar. The court further finds, however, that it is not at such an abysmal level to constitute actual failure to cooperate with the Board. The court therefore finds for Defendants on this issue.

### III. NATIONAL ENVIRONMENTAL POLICY ACT

Plaintiffs contend that the MRP/FEIS and ROD violate NEPA. First, Plaintiffs argue that the consideration of alternatives is inadequate because the NPS failed to provide evaluation of a reasonable range of alternatives and none of the action alternatives meet the requirements of WSRA. Second, Plaintiffs argue that the ROD fails to properly identify the MRP/FEIS's environmentally preferred alternative. Third, Plaintiffs argue that the MRP/FEIS fails to adequately disclose and evaluate significant impacts to ORVs and the free-flow of the Merced River.

The Ninth Circuit has summarized the process under NEPA as follows:

"The purpose of NEPA is to assure that federal agencies are fully aware of the impact of their decisions on the environment." *Friends of the Earth v. Hintz,* 800 F.2d 822, 836 (9th Cir.1986) (citing *Friends of Endangered Species, Inc. v.*

*Jantzen,* 760 F.2d 976, 985 (9th Cir. 1985)). To fulfill that purpose, NEPA requires all federal agencies to prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

To determine whether an EIS is necessary, the agency first prepares an EA, which briefly describes the need for, alternatives to, and environmental impacts of the proposed federal action. 40 C.F.R. § 1508.9 (1994). If the agency determines in the EA that the federal action will not significantly affect the environment, it makes a "finding of no significant impact" (FONSI), and its NEPA review ends. *Id.* § 1508.13. However, if the agency determines that the proposed action will significantly affect the environment, it then prepares a more thorough EIS concerning the project. *Id.* pt. 1502.

*California Trout v. Schaefer,* 58 F.3d 469, 472 (9th Cir.1995). In *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519–20 (9th Cir.1992)

The alternative section is "the heart of the environmental impact statement," 40 C.F.R. § 1502.14; hence, "[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Citizens for a Better Henderson v. Hodel,* 768 F.2d 1051, 1057 (9th Cir.1985). While the practicalities of the requirement are difficult to define, NEPA provides that all agencies of the Federal Government shall, to the fullest extent possible, "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Whether a particular EIS has met this demand can best

be determined by its purpose, which is to "ensure[ ] that federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental consequences, and [to] provide[ ] the public with information on the environmental impact of a proposed action and encourage[ ] public participation in the development of that information." *Kunzman,* 817 F.2d at 492; *see also Citizens for a Better Henderson,* 768 F.2d at 1056.

As a result, an agency must look at every reasonable alternative, with the range dictated by the 'nature and scope of the proposed action,' *Block,* 690 F.2d at 761, and "sufficient to permit a reasoned choice." *Methow Valley Citizens Council v. Regional Forester,* 833 F.2d 810, 815 (9th Cir.1987), rev'd on other grounds *sub nom. Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In *City of Carmel–By–The–Sea v. U.S. Department of Transportation,* 123 F.3d 1142, 1145 (9th Cir.1997) the court further explained as follows:

An Environmental Impact Statement must discuss "reasonable alternatives" to the proposed action. 42 U.S.C. § 4332(2)(C)(iii); *Alaska Wilderness Recreation v. Morrison,* 67 F.3d 723, 729 (9th Cir.1995); see 40 C.F.R. § 1502.14 (consideration of alternatives "is the heart of the environmental impact statement."). The "rule of reason" guides both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative. *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 195 (D.C.Cir.1991) (quoting *State of Alaska v. Andrus,* 580 F.2d 465, 475 (D.C.Cir. 1978)). The Environmental Impact Statement need not consider an infinite range of alternatives, only reasonable or feasible ones. 40 C.F.R. § 1502.14(a)-(c). [FN10]

FN10. Title 40 C.F.R. § 1502.14(a) requires that an Environmental Impact Statement:

Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from the detailed study, briefly discuss the reasons for their having been eliminated.

Project alternatives derive from an Environmental Impact Statement's "Purpose and Need" section, which briefly defines "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. The stated goal of a project necessarily dictates the range of "reasonable" alternatives and an agency cannot define its objectives in unreasonably narrow terms. *See Citizens Against Burlington,* 938 F.2d at 196.

We must determine whether the Final Environmental Impact Statement/Report's "Purpose and Need" was reasonable, particularly whether Level of Service C was a reasonable goal, and then whether the alternatives considered were reasonable in light of the cited project goals.

The MRP/FEIS lists five project alternatives considered by the NPS. The first alternative is a no action alternative pursuant to which "no comprehensive changes or new management activities would take place in the Merced River corridor." AR 4400. There are four action alternatives. Alternative 2, the preferred alternative, is the alternative which was adopted by the NPS. It is described in the FEIS as, "[t]he Visitor Experience/River Protection alternative provides for a balance of visitor experiences and access to the river corridor while protecting and enhancing ORVs and preserving the free-flowing condition of the river." AR 4400. Alternative 3 is

described as, "[t]he River Protection Emphasis with Narrow Corridor alternative focuses on resource protection of the river corridor in the floodplain areas." *Id.* Alternative 4 is described as, "[t]he River Protection Emphasis with Wide Corridor alternative promotes the most comprehensive protection and enhancement of natural and cultural resources in a broader area of the Merced River corridor." *Id.* Alternative 5 is described as, [t]he Visitor Experience Emphasis with Wide Corridor alternative provides for diverse visitor experiences and access to Yosemite National Park and the river corridor." *Id.*

Plaintiffs argue the NPS failed to provide evaluation of a reasonable range of alternatives, claiming in particular that the NPS did not fairly consider restoration and enhancement as an alternative activity in any zone and failed to consider a conservation or preservation alternative that would protect the river corridor in Yosemite National Park to the extent required under WSRA.

Defendants contend that the range of reasonable alternatives is limited to those which achieve the goals of the MRP. These goals expressly include five broad goals established originally for the 1980 General Management Plan, and five additional goals established for the Merced River Plan. The goals from the 1980 GMP which have been applied to the MRP include: (1) reclaim priceless natural beauty; (2) allow natural process to prevail; (3) promote visitor understanding and enjoyment; (4) markedly reduce traffic congestion; (4) reduce crowding. MRP, 23–24. The additional goals established for the Merced River Plan are: (1) protect and enhance river-related natural resources; (2) protect and restore natural hydrological and geomorphic processes; (3) protect and enhance river-related cultural resources; (4) provide diverse river-related recreational and educational experiences; (5) provide

appropriate land uses. The MRP states, "the five defining goals of the *General Management Plan* and the five goals of the *Merced River Plan* are intertwined, and no one goals can be emphasized to the complete exclusion of the others." MRP, 23. Defendants argue that the range of feasible alternatives for the MRP was thus limited to alternatives that furthered each of this broad spectrum of goals.

Defendants argue that given these parameters, the NPS considered a full range of alternatives, including alternatives that emphasized resources protection (such as Alternatives 3 and 4) and alternatives that emphasized visitor use (such as Alternative 5.) MRP A–10 –12. Defendants claim that despite their respective emphases, each alternative given full consideration in the MRP/FEIS furthered each of the planning goals. Defendants argue that in contrast, alternatives that did not meaningfully further all of the MRP goals were rejected from full consideration in the MRP/FEIS. Defendants cite as an example a zoning plan that allowed full restoration to the river to conditions that existed prior to European contact with Yosemite. AR 4445—46. This alternative was rejected for several reasons, including the mandate under the National Park's 1916 Organic Act, 16 U.S.C. §§ 1 and 2–4, that the National Park Service must provide for visitors' experiences of the natural and cultural resources of the Park. AR 4445. It was also rejected because it did not comply with the *General Management Plan* goal "to promote visitor understanding and enjoyment." *Id.*

In response to Plaintiffs' argument that the NPS failed to consider a conservation or preservation alternative that would protect the river corridor in Yosemite National Park to the extent required under WSRA, Defendants argue that each of the four action alternatives considered by the

NPS would meet the goals of WSRA. In response to Plaintiffs' claim that the NPS failed to considered "restoration and enhancement as an alternative activity in any zone" or "a conservation and preservation alternative," Defendants argue that these vague alternatives fail to accommodate the stated goals of the MRP, and that Plaintiffs have therefore failed to meet their burden of proof for establishing a feasible and practical alternative to those outlined in the MRP/FEIS. Defendants cite *Morongo Band of Mission Indians v. Federal Aviation Administration*, 161 F.3d 569, 576–77 (9th Cir.1998), in which the court explained:

> Related to this issue, the parties dispute who has the burden of offering feasible alternatives. I t is true that the FAA has the responsibility to "study, develop, and describe appropriate alternatives." 42 U.S.C. § 4332(2)(E). The FAA has fulfilled that requirement, however, by developing and discussing a number of alternatives, including Alternatives 7a, 7b and 4b.
>
> Moreover, in *City of Angoon*, we stated that the parties claiming a NEPA violation "had not offered a specific, detailed counterproposal that had a chance of success. Those who challenge an EIS bear a responsibility 'to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions.'" 803 F.2d at 1022 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). The Seventh and Eighth Circuits have similarly implied that the burden is on the party challenging the agency action to offer feasible alternatives. *See Olmsted Citizens for a Better Community v. United States*, 793 F.2d 201, 209 (8th Cir.1986) ("Olmsted Citizens to succeed on its claim must make some showing that feasible alternatives

exist. Absent such a showing Olmsted Citizens asks this court to presume that an adequate alternate site exists somewhere and that the government did not try hard enough to find this site . . . .") (internal citations and footnote omitted); *River Rd. Alliance, Inc. v. Corps of Eng'rs of United States Army*, 764 F.2d 445, 452–53 (7th Cir.1985) ("The Corps was entitled not to conduct a further study of alternatives unless the plaintiffs were prepared to shoulder the burden of showing that National Marine had overlooked some plausible alternative site— and they were not."). The FAA has fulfilled its obligation to consider reasonable alternatives.

Defendants argue that Plaintiffs have failed to propose a feasible alternative to the MRP that would satisfy NPS's multiple Congressional mandates, including continued visitor access and natural resources protection.

Defendants claim that Plaintiffs' argument that the NPS ignored suggestions from commentators to implement specific restoration projects is based on Plaintiffs' misunderstanding of the nature of the MRP as a programmatic plan, rather than an action plan. As discussed above, Defendants assert that the MRP functions to provide guidance for long-term planning for the river corridor. AR 5689. Defendants assert that the MRP in no way limits future specific restoration projects. Defendants cite an issues list dated November 20, 1999, in which NPS states, "[r]eplacement of the El Capitan Moraine could occur as a restoration project under Alternatives 2, 3, and 4." AR 6422.

Based on the above, the court concludes that Plaintiffs have not shown that Defendants acted arbitrarily or capriciously as to the range of alternatives considered.

Turning to Plaintiffs' second main argument that the ROD fails to properly identi-

fy the FEIS's environmentally preferred alternative, Plaintiffs argue specifically that the NPS incorrectly identified Alternative 2, the preferred alternative, as the environmentally superior alternative in the ROD. Plaintiffs argue that the NPS should have instead identified Alternative 4 as the environmentally preferred alternative, based on varied statements by the NPS to the effect that it provides the best protection for natural resources.

Pursuant to 40 C.F.R. 1505.2(b), the NPS was required to identify in its ROD the alternative in the EIS that is "considered to be environmentally preferable." The Council on Environmental Quality defines the environmentally preferable alternative as follows:

> Section 1505.2(b) requires that, in cases where an EIS has been prepared, the Record of Decision (ROD) must identify all alternatives that were considered, ". . . specifying the alternative or alternatives which were considered to be environmentally preferable." The environmentally preferable alternative is the alternative that will promote the national environmental policy as expressed in NEPA's Section 101. Ordinarily, this means the alternative that causes the least damage to the biological and physical environment; it also means the alternative which best protects, preserves, and enhances historic, cultural, and natural resources.

46 Fed.Reg. 18026 (1981).

Defendants argue that this guidance does not mandate the choice that causes the least damage to the biological and physical environment, but allows agencies to use their professional judgment in selecting the environmentally preferable alternative. Defendants contend that the NPS properly exercised its judgment in designating Alternative 2 as the environmentally preferred alternative by rigorously apply the criteria in NEPA section 101, 42 U.S.C. § 4331, to each of the alternatives.

> In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—
>
> (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
>
> (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
>
> (3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
>
> (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;
>
> (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
>
> (6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

Defendants argue that based on these factors, the NPS selected Alternative 2 as the environmentally preferred alternative because it, "surpasses the other alternatives in realizing the *full range* of national environmental policy goals as stated in Section 101 of the National Environmental Policy Act." AR 6042.

 In light of this court's duty to presume an agency action to be valid and

to affirm the agency action if a reasonable basis exists for its decision, *Independent Acceptance Co. v. California,* the court, after reviewing the parties' arguments at length, concludes that Plaintiffs have not demonstrated that Defendants acted arbitrarily or capriciously in regard to selecting Alternative 2 as the environmentally preferred alternative.

Finally, Plaintiffs' third main argument is that the MRP/FEIS fails to adequately disclose and evaluate significant impacts to ORVs and the free flow of the Merced River. This argument has two subsections. First Plaintiffs argue that the NPS's alleged WSRA violations also constitute NEPA violations. Second, Plaintiffs argue that the MRP/FEIS lacks an adequate analysis of the impacts related to the Valley Plan.

In *Salmon River Concerned Citizens v. Robertson,* 798 F.Supp. 1434, 1437–38 (E.D.Cal.1992), the court explained the review of the EIS process as follows:

> The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* requires the preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA sets forth "action-forcing" procedures designed to fully inform agency decision-makers of the environmental impact of their decisions. *Trustees for Alaska v. Hodel,* 806 F.2d 1378, 1382 (9th Cir.1986). The reason for the EIS requirement is that "decisions that are based on understanding of the environmental consequences" will "protect, restore and enhance the environment." 40 C.F.R. § 1500.1(c). An EIS must compile "full and fair" information on the significant environmental impacts and alternatives of the proposed action. 40 C.F.R. § 1502.1. The purpose of the draft EIS is to "inform decision-makers and the public of the reasonable alterna-

tives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.[FN4] Thus the EIS is intended to "provide decision makers with enough information to aid in the substantive decision whether to proceed with the project in light of its environmental consequences and to provide the public with information and an opportunity to participate in gathering information." *Northwest Coalition for Alternatives to Pesticides v. Lyng,* 673 F.Supp. 1019, 1022 (D.Or.1987).

FN4. The draft and final environmental impact statements must be circulated to: (1) any federal agency with jurisdiction or special expertise with regard to any environmental impact; (2) any federal, state or local agency responsible for development or ·enforcement of environmental standards; (3) the applicant, if any; (4) any person organization or agency requesting the statement; and (5) any person, organization or agency which submitted substantive comments to the draft statement. 40 C.F.R. § 1502.19.

A. Standard of Review

The district court reviews an EIS to determine whether it was prepared by the Forest Service in accordance with the procedure required by 5 U.S.C. § 706(2)(D). [FN5] The Ninth Circuit employs a "rule of reason": An EIS must contain a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" and make a reasoned decision. *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir.1992). "The reviewing court may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Oregon Environmental Council v. Kunzman,* 817 F.2d 484,

492 (9th Cir.1987). "A reviewing judge must make 'a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.... Once satisfied that a proposing agency has taken a "hard look" at a decision's environmental consequences, the review is at an end.' " *Mumma*, 956 F.2d at 1519, quoting *State of California v. Block*, 690 F.2d 753 (9th Cir.1982). "The reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies." *Kunzman*, supra, 817 F.2d at 492.

FN5. A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

In support of their initial argument, Plaintiffs repeat their contentions regarding Defendants' alleged WSRA violations. These contentions were discussed at length above and were rejected. The court finds, therefore, that these contentions do not support Plaintiffs' NEPA claims. Plaintiffs also claim that the MRP does not adequately address transit issues. Defendants argue that transit issues are beyond the scope of the MRP, other than the guidance the MRP gives for future implementation plans and projects. AR 4302. Defendants argue that the YVP addresses transit and its impacts in detail, and also note that the MRP analyzes the YVP as a cumulative project. AR 5548—49. The court finds that Plaintiffs fail to demonstrate that the NPS acted arbitrarily or capriciously on this issue.

In support of their second argument, Plaintiffs contend that an EIS must include an analysis of connected, cumulative, and similar actions. Plaintiffs claim that although the MRP/FEIS provides a listing of cumulative impacts in its Appendix G,

AR 5548, it does not provide any analysis of these impacts. Plaintiffs further claim that while the MRP/FEIS purports to evaluate the listed projects in each proposed alternative within the discussion of environmental consequences for natural, cultural or social resources, there is no real analysis of impacts. Rather, Plaintiffs claim, there is only generic reference to types of impacts, with little or no correlation of those categories to the actual activities that are reasonably foreseeable. Plaintiffs argue that given the detail known about specific projects envisioned by the YVP, the MRP/FEIS should have provided a more detailed analysis of their impacts.

Plaintiffs rely on 40 C.F.R. § 1508.25, which provides in part as follows:

§ 1508.25 Scope.

Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

"Cumulative impacts" are the collective environmental impacts of all "past, present, and reasonably foreseeable future actions" taking place in the affected area. *Sierra Club v. United States Forest Service*, 843 F.2d 1190, 1194 (9th Cir.1988) (quoting 42 C.F.R. § 1508.7 (1987)).

Defendants contend that the MRP/FEIS contains a thorough discussion of the cumulative impacts of the YVP, disclosing the cumulative impacts of the YVP for each of more than 25 impact topics in regard to Alternative 2. AR 4810—4961. Defendants argue that the thoroughness of this discussion is illustrated by the discussion on four particular topics: wetlands, air quality, scenic resources, and socio economic resources. For wetlands, the MRP/FEIS described the cumulative impacts of the YVP as follows:

[I]mplementation of the *Yosemite Valley Plan* is expected to have a long-term, beneficial impact to wetland resources by increasing coordinated management of natural resources and reducing facilities within sensitive habitats. However,

short-term, adverse effects of this plan may include temporary construction impacts (e.g., potential reconstruction of Segment D of the El Portal Road Reconstruction Project just above Cascades Diversion Dam). Reconstruction of Segment D could cause short-term adverse impacts to natural resources similar to those currently occurring during reconstruction on Segments A, B and C. These would include loss of mature riparian vegetation, loss of understory vegetation, impacts to special-status species, loss of topsoil, and footprint effects. Adverse impacts associated with Segment D reconstruction could be partially mitigated through project design (the design of Segment D would need to protect and enhance the Outstandingly Remarkable Values of the Merced River) and implementation of best management practices, compliance monitoring, and restoration. However, some of the proposed redevelopment in El Portal, for example, the redevelopment of the sand pit, would be inconsistent with the management zoning in this alternative of the *Merced River Plan*. The *Merced River Plan* guides future allowable actions within the Merced River corridor and subsequent implementation plans, such as the *Yosemite Valley Plan*. If Alternative 2 is selected, revisions to the *Yosemite Valley Plan* would be required to conform to the management zones provided in Alternative 2.

AR 4838. For air quality, the MRP/FEIS described the cumulative impacts of the YVP as follows:

The *Yosemite Valley Plan* (NPS) proposes to enhance the quality of the visitor experience in Yosemite Valley by reducing automobile congestion, limiting crowding, and expanding orientation and interpretation services. It also proposes traffic management systems and options for the size and placement of parking

lots, both within and without Yosemite Valley. Parking lot(s) outside the Valley could be used to intercept day visitors and shift those visitors to Valley-bound shuttle buses.

. . .

Although most of the aforementioned projects would have localized, short-term, adverse effects (e.g. construction-related effects), the general goal of each of these projects is to improve regional transportation, circulation, and safety. As such, these projects would, individually and in combination, encourage travel to the park by alternate (non-private vehicle) modes and would have a beneficial, long-term effect on air quality.

AR 4881. For scenic resources, the MRP/FEIS described the cumulative impacts as follows:

The *Yosemite Valley Plan* would have a local, long-term, beneficial impact on scenic resources in the Valley due to restoration of disturbed or developed land to natural conditions and, in particular, large-scale restoration of areas within the A-scenic category (areas considered to have the most significant scenic views within the Valley). The *Yosemite Valley Plan* also would include areas of new development in the Valley (largely consolidated in the east Valley), Wawona, and El Portal, resulting in adverse impacts due to visual intrusions in the scenic landscape. However, impacts in these areas contribute directly to the improvement of the scenery within the Valley by removing facilities and restoring impacted areas.

AR 4937. For the social environment, the MRP/FEIS described the cumulative impacts as follows:

The *Yosemite Valley Plan* would remove substantial amounts of employee housing from Yosemite Valley, and would construct new employee housing in El Portal and Wawona, among other loca-

tions. Redesigned housing in Yosemite Valley and new housing in El Portal and Wawona would substantially improve the quality of housing in those communities. The social environment in Yosemite Valley would experience local, long-term, beneficial effects associated with reduced crowding, more secure housing conditions, and increased privacy. The social environment of the workforce would experience local, long-term, adverse effects associated with increases in commuting time, change of housing locale, and a decrease in social amenities near housing sites. For the Yosemite Valley workforce, the adverse effects may be so severe that they would no longer be willing to work in the Valley and may leave the area. The social environment in El Portal and Wawona would experience local, long-term, adverse effects due to substantial increases in housing in these communities, although it is expected that the projected population growth would be gradual. Even though the *Yosemite Valley Plan* calls for the placement of community amenities in El Portal, there could be substantial strains on the limited community amenities of El Portal as employees transition from Yosemite Valley.

AR 4941.

The *Yosemite Valley Plan* would substantially reduce the number of lodging facilities and nominally reduce the number of campsites in Yosemite Valley, resulting in a local, long-term, adverse impact on the visitor population due to decreased opportunity to lodge and camp in the Valley. Since the number of less expensive lodging and camping units would be reduced under the *Yosemite Valley Plan,* the number of low income visitors able to stay overnight in the Valley may be reduced. This could represent a local, long-term, adverse im-

pact on the low-income visitor population.

AR 4946. Defendants argue that the discussions provided in these cumulative impact sections is more that what is required under NEPA. Defendants also provide discussion of the cumulative environmental effects of the transit projects, including those within the YVP. AR 4928–30.

 While Plaintiffs argue at length that Defendants' discussion of cumulative impacts is insufficient in light of the variety of planned development projects, particularly those in the YVP, Plaintiffs provide no authority for exactly how much detail is required on the part of an agency identifying cumulative impacts. After reviewing the parties' arguments and the administrative record, the court finds that Plaintiffs have not demonstrated that Defendants acted arbitrarily or capriciously in regard to this issue. The court therefore finds for Defendants on this issue.

## PARKING LOT AT CAMP 6

Plaintiffs contend that when the NPS issued a categorical exclusion on June 24, 1999, for the construction of a Camp 6 parking lot and the inclusion of the projection within its Traffic Management Program, it violated NEPA by failing to provide a reasoned explanation why the project would not have a significant effect on the human environment and why the project did not fall within an exception to the categorical exclusion ("CE"). AR 27547–27549. Plaintiffs argue that the NPS cannot rely upon the Department Manual categorical exclusions because the presence of specific exceptions preclude the NPS from using such CE's. Plaintiffs conclude, therefore, that the NPS was required to prepare an EA or EIS for this project.

Defendants contend that Plaintiffs' challenge to the 1999 CE must be rejected for three reasons, only the first of which the court finds it necessary to address. Defendants contend that Plaintiffs' complaint does not include a claim challenging the 1999 CE and that all of the claims challenge the validity of the MRP. Defendants argue, therefore, that Plaintiffs' complaint does not comply with the notice requirements of Rule 8, Federal Rules of Civil Procedure, in regard to this claim. In support of this contention Defendants correctly state that the complaint in this action includes ten causes of action, each of which seeks relief in regard to the MRP under NEPA, WSRA and/or the APA. None of these causes of action challenges the NPS' decision in 1999 to issue a CE for a new parking lot at Camp 6.

Plaintiffs' references to the 1999 CE in the complaint include paragraph 43, which states as follows under the heading, "Other Activities Impacting the Merced River":

4. In 1999, NPS built a "temporary" parking lot of an estimated 20 acres within one-quarter mile of the Merced River at Camp 6. NPS widened a small disturbance at the site, graded the enlarged area, and lay down crushed gravel. NPS prepared no analysis under NEPA of the site-specific or cumulative impacts of constructing this new parking lot. NPS also made no determination that the ORVs or free-flow of the river would be protected and enhanced by this activity. Rather, on June 24, 1999, NPS issued a "categorical exclusion" that the lot was excluded from public notice and comment and from any environmental analysis. In the Merced River CMP/FEIS, NPS allows the improvement of the parking lot to now include an asphalt surface, which will detract from the scenic beauty of the area, allow for confined run off of automobile wastes, and concentrate motorized vehicles in an area next to the river. And yet NPS has never considered, analyzed, or disclosed the site specific or cumulative impacts of

the recently constructed parking lot or any improvements to it, in the CMP/FEIS or in any previous analysis.

Subsequently, under the Eighth Cause of Action for violation of NEPA, Plaintiffs allege as follows:

83. NPS failed to include a complete discussion of impacts and effects to ORVs and the free-flowing character of the Merced from the activities allowed in the CMP/FEIS within the various management zones. Among other activities, the CMP/FEIS fails to consider, analyze, or disclose the site specific or cumulative impacts of the original construction and reasonably foreseeable improvement of a new parking lot at Camp 6 within one-quarter mile of the Merced River.

■ Rule 8, Federal Rules of Civil Procedure, provides in part as follows:

(a) Claims for Relief. A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

A complaint has been sufficiently pleaded if it gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Ninth Circuit has held:

Courts have recognized that the main purpose of the complaint is to provide notice to the defendant of what plaintiff's claim is and the grounds upon

which the claim rests. *BBD Transportation Co. v. Southern Pac. Transp. Co.,* 627 F.2d 170 (9th Cir.1980). The rules clearly "reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). However, notice to the defendant of the mere existence of a grievance is not enough, and while it is not necessary that plaintiff state sufficient facts to constitute a cause of action, plaintiff must at least set forth enough details so as to provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery. *Id.,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Dioguardi v. Durning,* 139 F.2d 774 (2nd Cir.1944); *Committee on Children's Television, Inc. v. General Foods Corp.,* 35 Cal.3d 197, 197 Cal.Rptr. 783, 673 P.2d 660 (1983).

*Self Directed Placement Corp. v. Control Data Corp.,* 908 F.2d 462, 466 (9th Cir. 1990).

■ Plaintiffs rely on the above-quoted language from paragraph 43 of the complaint to argue that the complaint gives sufficient and fair notice under Rule 8 that its legal grounds for recovery included NEPA and the issuance of an illegal categorical exclusion for the Camp 6 parking lot. The court finds that the language in paragraph 43 does not give Defendants fair notice that Plaintiffs intended to pursue a separate claim alleging a NEPA violation based on the issuance of the 1999 CE. While Plaintiffs allege that the NPS "prepared no analysis under NEPA" of the impacts of constructing the parking lot and did not consider the protection of the ORVs or the free flow of the river, no

allegations regarding an defect in the 1999 CE are made. Rather, it is simply stated that the NPS issued the CE. The remainder of the paragraph alleges deficiencies in the MRP/FEIS.

The court further finds that paragraph 83 contains the only reference to Camp 6 within the enumerated causes of action, and that it refers only to a NEPA violation in the MRP/FEIS of failing to disclose the impacts of the original construction and improvement of the parking lot. Nothing is alleged as to a separate NEPA violation based on the 1999 CE.

Furthermore, the court notes that the only reference to NEPA in Plaintiffs' prayer for relief is a request that the court issue the following:

> 7. A declaratory judgment that the CMP/FEIS fails to comply with procedures and requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370(d) and CEQ regulations, 40 C.F.R. §§ 1500–1517.7.

Thus, nothing in Plaintiffs' prayer for relief provides notice to Defendants that Plaintiffs seek relief based on a NEPA violation stemming from the issuance of the 1999 CE, completely apart from the MRP/FEIS.

Finally, there is evidence in the record that Defendants did not receive actual notice of Plaintiffs' intention to pursue a separate NEPA claim based on the issuance of the 1999 CE. In their response to Plaintiffs' objections to the administrative record, Defendants address Plaintiffs' request for a copy of the May 1999 CE for the Camp 6 parking lot by stating that this document was not included in the Administrative Record because it was not relied upon by the NPS in the decision-making process for the Merced River Plan. This is a strong indication that Defendants were unaware that Plaintiffs were pursuing any claim apart from those based on the MRP. Although Defendants stated that they would provide Plaintiffs with a copy of the document, there is nothing in the record showing that Plaintiffs attempted to inform Defendants of their intention to pursue a NEPA claim separate and apart from that based on the MRP.

Based on the above, the court must conclude that the complaint failed to give Defendants the notice required pursuant to Rule 8 of Plaintiffs' intention to pursue a separate NEPA claim based on the issuance of the CE in 1999, completely apart from the MRP. This claim raised for the first time in Plaintiffs' trial briefs. Accordingly, the court will not address this claim in the present case.

## CONCLUSIONS OF LAW

In light of the foregoing, the court concludes as follows;

1) Defendants are entitled to judgment on Plaintiffs' first cause of action alleging violation of the portion of court's opinion and order entered on July 12, 1999, in *Sierra Club, et al. v. Babbitt, et al.*, 69 F.Supp.2d 1202 (E.D.Cal.1999), requiring Defendants to prepare and adopt a valid comprehensive management plan for the Merced Wild and Scenic River pursuant to 16 U.S.C. § 1274(d).

2) Defendants are entitled to judgment on Plaintiffs' second cause of action alleging violations of the Wild and Scenic Rivers Act.

3) Plaintiffs are entitled to declaratory judgment and injunctive relief on their third cause of action for violation of the requirement pursuant to 16 U.S.C. § 1274(a)(62)(A) to adopt appropriate revisions to the Yosemite General Management Plan.

4) Defendants are entitled to judgment on Plaintiffs' fourth cause of action

alleging violations of the Wild and Scenic Rivers Act.

5) Defendants are entitled to judgment on Plaintiffs' fifth cause of action alleging violations of the Wild and Scenic Rivers Act.

6) Defendants are entitled to judgment on Plaintiffs' sixth cause of action alleging violations of the Wild and Scenic Rivers Act.

7) Defendants are entitled to judgment on Plaintiffs' seventh cause of action alleging violations of the National Environmental Policy Act.

8) Defendants are entitled to judgment on Plaintiffs' eighth cause of action alleging violations of the National Environmental Policy Act.

9) Defendants are entitled to judgment on Plaintiffs' ninth cause of action alleging violations of the National Environmental Policy Act.

10) Plaintiffs are entitled to judgment on one part of their tenth cause of action alleging violations of the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* The Administrative Procedure Act provides at 5 U.S.C. § 706 that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Plaintiffs are entitled to judgment on the portion of their tenth cause of action found at paragraph 92 to the same extent as they are on their third cause of action for violation of the requirement pursuant to 16 U.S.C. § 1274(a)(62)(A) to adopt appropriate revisions to the Yosemite General Management Plan.

**ORDER**

1) The objections of all parties to the declarations filed in this case are OVERRULED, and all motions to strike portions of declarations are DENIED;

2) The exhibits attached to the amicus brief filed by the Natural Resources Defense Council, along with all portions of the amicus brief which rely on those exhibits, are STRICKEN;

3) The Clerk of the Court is directed to enter judgment for Defendants on Plaintiffs' first, second, fourth, fifth, sixth, seventh, eighth, and ninth causes of action;

4) The Clerk of the Court is directed to enter a declaratory judgment for Plaintiffs on their third cause of action. A mandatory injunction shall issue requiring Defendants to revise the GMP to meet the requirements of section 1274(b), as required by section 1274(a)(62)(A), within 180 days from the date of service of this Order;

5) The Clerk of the Court is directed to enter judgment for Plaintiffs on their tenth cause of action on the same basis as the third cause of action.